Simon E. GLUCK, John R. Clarke, Harry G. Ganderton, Robert K. Williams, George E. Lund, Jack Richards, Richard Jackson, Charles S. Derenzi, John Lapic, Angelo Deluca, Gwen Smolnik, John Maloney, Lee N. Caplan, William E. Howe, Jr., Joseph G. Barney, Lawrence G. Wagner, Harold D. Atkins, John E. Legory, and Mark Wright, on behalf of themselves and all others similarly situated,

v.

UNISYS CORPORATION, Unisys Pension Plan, Administrative Committee of the Unisys Pension Plan and all Members Thereof and Retirement Committee of the Burroughs Employees' Retirement Income Plan and All Members Thereof, Kenneth L. Miller, Jack A. Blaine, Michael R. Losey, John J. Loughlin, Stefan C. Riesenfeld, Michael R. Capo, Stanley Jones, Walter J. Williams, Richard H. Bierly, Bobette

Jones, Raymond V. Thomas, Thomas E. McKinnon, Michael N. Johnson, Ronald C. Anderson, Leon J. Level and William N. Geary, Simon E. Gluck, Lee N. Caplan, John R. Clarke, Harry G. Ganderton, Robert K. Williams, William E. Howe, Jr., George E. Lund, Jack Richards, Richard Jackson, Charles S. DeRenzi, John Lapic, Angelo DeLuca, Max Rosenzqeig, Gwen Smolnik, Joseph G. Barney, Lawrence G. Wagner, Angelo R. DiPetro, Joseph J. McCarthy, Charles Martino, Harold D. Atkins, John E. Legory, and Mark Wright, on behalf of themselves and all others similarly situated, Appellants.

No. 91–1170.

United States Court of Appeals, Third Circuit.

Argued Aug. 6, 1991.

Decided March 31, 1992.

Roslyn G. Pollack, Howard J. Eichenbaum, Leslie M. Thoman, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., Charles R. Watkins (argued), Suzanne McCarthy, Jeffrey L. London, Sachnoff & Weaver, Chicago, Ill., for appellants.

Joseph J. Costello, Robert J. Lichtenstein, Francis M. Milone (argued), Morgan, Lewis & Bockius, Philadelphia, Pa., Joseph A. Teklits, Unisys Corp., Blue Bell, Pa., for appellees.

Before MANSMANN and ALITO, Circuit Judges, and DIAMOND, District Judge.[*]

_____

[*] Honorable Gustave Diamond of the United States District Court for the Western District of Pennsylvania, sitting by designation.

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

In this appeal we are called upon to interpret the "actual knowledge" requirement in ERISA's limitation on actions for breach of fiduciary duty, to determine the effect of a choice of law provision in an ERISA plan, and to address the standard for determining a partial termination for ERISA purposes.

Here employees of Unisys Corporation and its predecessor, Burroughs Corporation, brought this action for violations of, and breaches of fiduciary duty under, the Employee Retirement Income Security Act (ERISA), and for related state law claims. The district court barred the fiduciary claims as untimely because they were filed more than three years after an event giving rise to the breach, but held that the employees' other ("non-fiduciary") claims were timely under Michigan's six-year statute of limitations. Nonetheless, the district court dismissed these non-fiduciary claims on the grounds, inter alia, that a "partial termination," which would have effected a vesting of the employees' accrued benefits, had not occurred.

We hold that the district court erred as a matter of law in dismissing the fiduciary claims, because ERISA requires that a plaintiff must have actual knowledge of the fiduciary breach or ERISA violation underlying a breach of fiduciary duty claim, and here it is not clear precisely what the employees knew and when. Thus we will reverse the order of the district court which barred the fiduciary claims and remand for a finding of the date the plaintiffs acquired actual knowledge.

Secondly, we find that although the district court erred in applying the Michigan limitations period to the non-fiduciary claims, the district court's decision to reach the merits of the non-fiduciary claims was correct for a different reason and the court's disposition will be generally affirmed. However, with respect to the

"non-fiduciary" claim involving partial termination, we further conclude that a partial termination may have resulted as a matter of law. We will therefore reverse that part of the district court's judgment dismissing the employees' complaint for failure to state a claim.

## I.

Simon E. Gluck and the other named plaintiffs are Pennsylvania residents who, with few immaterial exceptions, worked for over 20 years for Unisys Corporation or its predecessor, Burroughs Corporation. The defendants are the Unisys pension plan, Unisys Corporation, and the various fiduciaries and administrators of the Unisys and Burroughs plans.

From 1951, Burroughs maintained the Burroughs Employees' Retirement Income Plan ("BERIP"), a defined benefit plan [1] consisting of two separate parts. Under the first, "non-contributory" part, all employees received annual retirement benefits without any obligation to pay money into the plan. The second, "contributory" part, was voluntary, and required after-tax employee contributions.

An employee who chose to become a "contributory member" was entitled to receive an additional "contributory retirement benefit" equal to an annual payment of 40 percent of his total contributions. The amount of the accrued contributory benefit thus increased with each payment. The right to receive the contributory benefit vested after a contributory member either reached age 65 before discontinuing contributions or had made continuous contributions over a 10 year period of employment.

Any contributory member could discontinue voluntary contributions and receive a refund of the amount contributed plus interest at a rate of two to five percent. Contributory members whose benefit had vested, however, could discontinue voluntary contributions, receive a refund of their total contributions with interest, and *still*

receive the defined contributory benefit, less the withdrawn contributions, the actuarial value of which BERIP set at ten percent per year of the amount withdrawn. For example, if a vested employee elected a refund on the day of his retirement after contributing a total of $1,000, he would receive $400 per year minus $100 per year, or $300 per year under the formula: $(40\%)(\$1,000) - (10\%)(\$1,000) = \$300$. In this litigation, the parties have referred to the remaining defined contributory benefit (the $300 per year in our example) as the "residual benefit" or "residual."

BERIP also provided early retirement benefits for both contributory and non-contributory members whose benefits had vested. The formula for a contributory early retirement benefit reduced the normal contributory retirement benefit by one-half of one percent for each calendar month by which the retirement date preceded the retiree's sixty-second birthday. In our example, a contributory member retiring on his sixty-first birthday would receive $282 annually, that is, $300 minus 6%. Members who retired after age 60 with over 30 years of service would receive their full, unreduced benefit. In our example, a 61–year old member with 30 years' service would receive the full $300 per year, as compared to $282 per year received by a similarly situated member without 30 years' service.

Based on actuarial assumptions about Burroughs' future liabilities under BERIP, Burroughs funded both the contributory and the non-contributory parts of the plan with pre-tax dollars and invested the assets of the plan, including the employee contributions, at market rates of interest. It is undisputed that in 1984, the assets in the plan exceeded the present value of Burroughs' liability to pay future defined benefits. In their complaint, the employees claim that this overfunding, or "surplus," amounted to $100,000,000.

---

**1.** A "defined benefit" plan sets a fixed benefit, in contrast to a "defined contribution plan," which provides for benefits based solely on the amount an individual contributes and the investment return on that amount.

Sometime in 1984, Burroughs amended BERIP to terminate the contributory part of the plan, effective July 1, 1984. Also effective July 1, 1984, Burroughs initiated the Burroughs Employees Savings Thrift ("BEST"). BEST is a 401(k) plan, in which employees could defer income, receive matching contributions by Burroughs, and make additional voluntary contributions. BEST participants are at all times 100% vested in their own deferred and additional contributions, and vested according to a schedule in the company's matching contributions.

Burroughs heralded the 1984 creation of BEST as

a major addition to your benefits which will give you an opportunity to enhance substantially your future financial security.

The Burroughs Employees Savings Thrift (B.E.S.T.) plan represents a significant improvement in your benefit package and a major financial commitment from the Company.... Because the B.E.S.T. offers a more tax-efficient way to build a personal investment fund, on June 30 we are discontinuing ... the contributory portion of Burroughs Employees' Retirement Income Plan.... If you are contributing to Burroughs' retirement plan, you'll receive a personal letter in April showing your account balance. Your contributions plus interest will be transferred to the new B.E.S.T. and invested or paid out as you direct.

Letter from W.M. Blumental, CEO (Feb. 15, 1984), App. at 367.

The amended BERIP gave two options to contributory members, who could no longer accrue contributory benefits by paying into BERIP. Contributory members could opt to withdraw their total contributions, as they could have done under BERIP. Under the amended BERIP, they would receive five percent interest applied retroactively to all contributions. Vested contributory members would receive the residual benefit, calculated, as under the original plan, by reference to their total contributions. Alternatively, a contributory member's total contributions and interest would be transferred to a BEST account and he would receive the residual benefit based on contributions through June 30, 1984. Thus, employing our previous example, a *non-vested* contributory member could either elect to receive $1,000 cash and *no* residual, or to transfer the $1,000 to BEST and receive a residual upon retirement of some amount less than $300 per year.[2] Under the amended BERIP, vested contributory members still received the residual, calculated from the time contributory participation had ended, which at the latest would be June 30, 1984, the date on which the contributory part of the plan ended.

The company literature explained these options in a letter dated March 5, 1984, as follows:

As a contributory member of Burroughs Employees' Retirement Income Plan, you may be interested in the personal impact of recently announced changes in our benefit package for retirement ...

★ First of all, the *noncontributory* part of the plan, fully paid by the Company, remains in place with an improved benefit formula. The new Burroughs Employees Savings Thrift (B.E.S.T.) plan will be replacing the *contributory* part of the plan.

★ As in the past, all the retirement contributions you have made plus interest are *yours* to do with as you choose. They will be transferred to B.E.S.T.

**2.** The formula for the residual to be paid to nonvested contributory members remained 40% of the total contributions through June 30, 1984, less the actuarial value of those contributions, which had been transferred to the individual's BEST account. The actuarial value, set by the amended BERIP, was "the sum of the employee's credited contributions and interest as of June 30, 1984 and interest at the rate of 5 percent compounded annually on such amount to the employee's normal retirement date, multiplied by 10 percent." Amended BERIP, App. at 205.

For a contributory member who transferred $1,000 to BEST, the value of the residual on July 1, 1984, would be $300 per year under the formula: (40%)($1,000) (10%)($1,000 0% interest). On July 1, 1985, the value of the residual would be $295 per year: (40%)($1,000) (10%)(1,000 5% interest). On July 1, 1986 the residual would be $289.75 per year, and so on.

unless you decide to withdraw them prior to July 1, 1984.

★ Besides the noncontributory retirement benefit, you may be eligible for an additional Company-paid benefit from the retirement plan as a result of your prior contributions. This benefit, referred to as a residual benefit, is what remains from prior Company contributions after *your* contributions plus interest are no longer in the plan. When your account balance transfers to B.E.S.T., this residual benefit, if any, will remain in the retirement plan and *become part of your regular benefit* provided by Burroughs.

. . . .

Before employee meetings begin, we will provide you with a personalized letter which shows your contributions plus accrued interest. It will also show your approximate residual benefit, if any, at age 65 upon transfer of your account to B.E.S.T.

App. at 369 (emphasis in original). The "personalized" letter, dated March 29, 1984 began: "Dear Burroughs employee: As you know, Burroughs is improving its benefit package to enhance your future financial security." On the reverse side, the letter continued:

Your contributory account balances as of February 29, 1984, are indicated below. The residual benefit noted which will remain in the retirement plan, is the estimated additional annual normal (age 65) retirement benefit you would receive. . . .

. . . .

When account balances transfer to B.E.S.T.:

Your account balances noted above will increase by the amount of your contributions between March 1 and July 1 and continue to earn interest (5% per year) until the month of transfer.

. . . .

If you withdraw your contributory account balance:

. . . .

Should you choose this alternative, you will not receive a residual benefit, if you are eligible for one, unless you are at least age 65 or have continuously contributed for a period during which you are credited with 10 or more years of service.

App. at 371–72. The prospectus described the change as follows:

Contributory feature discontinued

Because B.E.S.T. provides a more tax advantageous and flexible savings opportunity, the contributory part of the Retirement Income Plan will end as of July 1, 1984. Here are some things you should note:

. . . .

Further, if you become vested in the retirement plan, you will continue to be eligible for the accrued benefits, if any, attributable to Company contributions as the result of your prior participation. This "residual benefit" will become part of your pension benefit. If you're affected, you will be notified.

App. at 500–01.

The amended BERIP also reduced early retirement benefits for all participants *except* members with either 20 or more years of service or those aged 55 or older on June 30, 1984. The amended BERIP calculated the early retirement benefit by reducing the normal retirement benefit one-half of one percent for each month by which the early retirement date would precede the retiree's sixty-fifth (rather than sixty-second) birthday. Thus, a contributory member with less than 20 years of credited service, who on his sixty-second birthday had been entitled to receive an additional $100 per year, would be entitled only to an additional $82 per year: $100 − (6% per year) (3 years) = $82.

The employees claim that the 1984 termination of the contributory part of the plan, together with the reduction of the early retirement contributory benefit, increased the surplus (the amount by which the plan was overfunded) because these two actions decreased Burroughs's expected future liability.

One further event is critical here. Effective April 1, 1988, after a merger of Burroughs and Sperry Corporation created Un-

isys Corporation, the amended BERIP was merged into the Unisys Pension Plan. The Unisys plan established a uniform retirement benefit for covered employees. It did not provide for payment of the residual, except that a limited class of employees were entitled, by a "grandfather clause," to have their retirement benefit calculated under the amended BERIP, and not under the Unisys plan.[3] The Unisys plan thus put contributory and non-contributory BERIP participants on equal footing. Despite their many years of contributions, former BERIP contributory participants did not receive any additional retirement benefit under the Unisys plan. The employees—former contributory members— allege that any overall increase in benefits to all of the employees was funded, at least in part, by amounts formerly allocated to pay the residual to the contributory members.

The Unisys plan also further reduced the early retirement benefit formula. It maintained the exception for those with 20 or more years of service, but eliminated the early retirement benefit for those with 30 or more years of service. Also continued in 1988 was BEST, which appears to have been amended by resolution dated April 11, 1988, and renamed the Unisys Savings Plan. App. at 351.

On March 2, 1990, a group of employees filed the complaint which commenced this action in the United States District Court for the Eastern District of Pennsylvania, followed by an amended complaint adding plaintiffs, and a second amended complaint adding defendants. The employees asserted that, in violation of ERISA, the 1984 amendment to BERIP and the 1988 merger of the amended BERIP into the Unisys plan deprived them of residual benefits and surplus allocable to the contributory program, improperly reduced accrued, vested and early retirement benefits, and forced withdrawals in 1984 of amounts for which impermissibly low interest was paid. The employees further asserted that the plan fiduciaries and administrators improperly

used funds from the contributory program to subsidize liabilities of the companies to pay other benefits. Additionally, the employees asserted claims against those responsible for operating BERIP and Unisys plans for breach of fiduciary duty for causing the underlying ERISA violations. Finally, the employees asserted state law claims.

The defendants moved to dismiss the complaint pursuant to Rules 12(b)(6) and 56. The district court addressed first the timeliness of the employees' claims. BERIP, the amended BERIP and BEST designated Michigan law as governing unless preempted by ERISA. Michigan has a six-year limitations period for contract actions. The Unisys plan designated Pennsylvania law, which defendants argue would implicate a three-year limitations period. The district court dismissed the fiduciary claims as time-barred, and although the district court held the non-fiduciary claims to a six year statute of limitations, it dismissed them for failure to state a claim upon which relief could be granted. This appeal followed.

Our subject matter jurisdiction over the district court's final order is founded on 28 U.S.C. § 1291. We stated our standard of review for Rule 12(b)(6) dismissals in *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 444 (3d Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978) (citations omitted):

> [W]hether taking the allegations of the complaint as true, ... and viewing them liberally, giving plaintiffs the benefit of all inferences which fairly may be drawn therefrom, ... "it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim[s] which would entitle them to relief."

The district court labeled its judgment as granting a motion to dismiss for failure to state a claim. The district court appears to have granted, in some respects, a motion for summary judgment, for example, by

---

**3.** Employees who were at least 50 years old on March 31, 1988, and who had accrued ten or more years of vesting service under BERIP could have their benefit calculated under BERIP *if* it was higher than that calculated under the terms of the Unisys plan.

considering the statute of limitations defense rather than merely testing the sufficiency of the claims. Nonetheless, we review the district court opinion as having granted a motion to dismiss only.

We address first that part of the district court's opinion that concerned the timeliness of both the fiduciary claims and the "non-fiduciary" claims.

## II.

### The Fiduciary Claims

ERISA bars actions for breach of fiduciary duty "after the earlier of (1) six years after ... the date of the last action which constituted a part of the breach or violation, ... or (2) three years after the earliest date on which the plaintiff had *actual knowledge of the breach or violation....*" 29 U.S.C. § 1113 (emphasis added).[4]

Because the employees filed their first complaint over five years after the 1984 amendment to BERIP, we must decide when, for purposes of section 1113, a plaintiff has "actual knowledge of the breach or violation." The defendants argue, and the district court apparently assumed, that a plaintiff acquires "actual knowledge of the breach or violation" when he has gained actual knowledge of the actions constituting the breach or violation. The district court thought the 1984 amendment itself constituted the breach or violation and barred the claim based on the employees' knowledge of that amendment and its terms. As we describe below, however, ERISA requires actual knowledge of all of the elements of the violation alleged here, failure to vest accrued benefits after a partial termination. These elements include the creation of a potential reversion of funds to the plan sponsor. Although the employees might have discovered all the elements of a partial termination claim, the district court must determine, as a factual matter, the date on which each employee had actual knowledge of the breach or violation.

Section 1113 sets a high standard for barring claims against fiduciaries prior to the expiration of the section's six-year limitations period. Although the statute specifically measures the longer six-year period from "the last action which constituted the breach or violation," the statute measures the earlier three-year bar only by reference to the plaintiff's knowledge of the breach.

Of course, a plaintiff may have constructive knowledge of a breach before he actually knows of the breach, but section 1113 calls for actual knowledge. Other ERISA limitations periods do not demand as much. For example, section 1303, which limits actions brought by the Pension Benefit Guarantee Corporation, measures a three-year period from "the earliest date on which the corporation acquired *or should have acquired* actual knowledge of the existence of such cause of action." 29 U.S.C. § 1303(e) (emphasis added); *see also* 29 U.S.C. § 1370(f)(2)(A) (same language). Congress knew how to require constructive knowledge; it required it in sections 1303 and 1370. We do not think that Congress' failure to call for it in section 1113 was accidental.

Our sister courts of appeals have recognized the stringent requirement imposed by section 1113. In *Radiology Center, S.C. v. Stifel, Nicolaus & Co.*, 919 F.2d 1216 (7th Cir.1990), an investor sued his former stockbroker for breach of fiduciary duty with respect to the broker's churning of a Keogh account. The investor had instructed the broker to invest in low-risk securi-

---

4. 29 U.S.C. § 1113 reads in full:
§ 1113. Limitation of actions
 No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—
 (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission,

the latest date on which the fiduciary could have cured the breach or violation, or
 (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

ties. He had received a confirmation of each trade and reviewed monthly statements that summarized account activity, but he was unable to find in newspaper stock tables the name of any stock traded. Suspecting the stocks were not low-risk securities, he instructed the broker to buy a particular stock, only to discover later that the broker sold it within two weeks. After all this, the investor finally removed the account to another broker at a different firm, and brought suit more than three years after the broker's last disputed trade. He claimed actual knowledge only as of the time—within the three-year period—when the subsequent broker reviewed and denounced the trades the defendant broker had executed. Despite the investor's admissions of actual knowledge of all the transactions constituting the broker's breach, the Court of Appeals for the Seventh Circuit remanded for a determination of whether the investor "had actual knowledge of [his] ERISA claim" by the relevant date. *Id.* at 1223.

The Court of Appeals for the Ninth Circuit has also recognized the rigorous "actual knowledge" requirement of section 1113. In *Ziegler v. Connecticut General Life Ins. Co.*, 916 F.2d 548 (9th Cir.1990), the court located the ERISA breach in an investment agreement that gave the plan's brokers an unconscionably high rate of return. Although the plan's administrators, who were plaintiffs, had themselves executed the contract, they did not acquire actual knowledge of the ERISA breach when they signed the contract. Rather, they acquired it sometime later, after the broker had informed them of the violative provision's effect. The court wrote: "We stress that an ERISA plaintiff's cause of action cannot accrue and the statute of limitations cannot begin to run until the plaintiff has actual knowledge of the breach regardless of when the breach actually occurred." *Id.* at 552. The Court of Appeals for the Eleventh Circuit has adopted a similar approach, writing: "To charge the Secretary [of Labor] with actual knowledge of an ERISA violation, it is not enough that he had notice that something was awry; he must have had specific knowledge of the actual breach of duty upon which he sues." *Brock v. Nellis*, 809 F.2d 753, 755 (11th Cir.1987).

Although we have not addressed the application of section 1113 directly, we have noted that the statute recognizes that when a transaction does not affect employees' day-to-day working conditions, it is less likely that employees will immediately become aware of a grievance. *Adams v. Gould, Inc.*, 739 F.2d 858, 867 (3d Cir. 1984). Thus, actual knowledge of all material facts constituting a breach of fiduciary duty or violation of ERISA is the *sine qua non* for application of section 1113's three-year limitation. A plaintiff must have, in the plain words of the statute, "actual knowledge of the breach or violation." A defendant is protected both by the statute's absolute six-year bar, and by the three-year limit, which prevents plaintiffs who know their rights from pausing too long in pressing their claims.[5]

■ We hold that, under 29 U.S.C. § 1113(2), "actual knowledge of a breach or violation" requires that a plaintiff have actual knowledge of all material facts necessary to understand that some claim exists, which facts could include necessary opinions of experts, *see Radiology Center*, 919 F.2d at 1218, knowledge of a transaction's harmful consequences, *see Ziegler*, 916 F.2d at 552, or even actual harm, *see Meagher v. IAM Pension Plan*, 856 F.2d 1418, 1422–23 (9th Cir.1988) (receipt of each impermissibly reduced benefit check constituted actual knowledge and commenced a separate three-year period; the earlier impermissible reduction in plan did not). We emphasize, however, that our holding does not mean that the statute of limitations can never begin to run until a plaintiff first consults with a lawyer.

In so holding, we differ somewhat from the rigid formulation that "[t]he statute of

---

5. Although not implicated here, we note that the six-year limitation period of section 1113(1) does not protect defendants in instances involving concealment or fraud. 29 U.S.C. § 1113 (last clause).

limitations is triggered by ... knowledge of the transaction that constituted the alleged violation, not by their knowledge of the law," *Blanton v. Anzalone,* 760 F.2d 989, 992 (9th Cir.1985), because that formulation developed under circumstances quite different from those presented here. In *Blanton,* the defendants tried to use their own ERISA violation as a shield to liability; the plaintiff had asserted an interest in real property that the defendants had placed in her deceased husband's individual plan account, and the defendants attempted to void, as prohibited by ERISA, the transaction that put the property in the account. They argued that the statute of limitations did not prevent them from voiding their own actions because they did not discover that they had violated ERISA until they consulted with an attorney in connection with their defense. The court rejected their argument with the broad statement that their knowledge of the transaction, not of the law, triggered the statute of limitations. *Id.* at 992. [6] We disagree that mere knowledge of a transaction is always enough. "Actual knowledge of a breach or violation" requires knowledge of all relevant facts at least sufficient to give the plaintiff knowledge that a fiduciary duty has been breached or ERISA provision violated.

■ Application of section 113 first requires identification and definition of the underlying ERISA violation upon which the fiduciary breach claim is founded. *See Meagher,* 856 F.2d at 1422. Two temporal determinations must then be made: the date of the last action which formed a part of the breach and the date of the plaintiff's actual knowledge of the breach.

The employees' complaint identifies, in essence, four types of violations underlying their allegations of breach of fiduciary duty: (1) discontinuance of the contributory program and of the residual in viola-

tion of 26 U.S.C. § 411(d)(3), which requires that accrued benefits be fully vested upon partial termination of a plan; (2) reduction of accrued early retirement benefits in violation of 29 U.S.C. § 1054(g); (3) transfer of assets to a new plan in violation of 26 U.S.C. §§ 401(a)(12), 414(*l*), which require that a participant receive a benefit under the new plan equal to or greater than the benefit he would have received under the old; and (4) use of the overfunding in violation of 29 U.S.C. § 1104(a)(1)(A), which requires a fiduciary to discharge his duties for the exclusive purpose of providing benefits to participants. The employees have not appealed the district court's dismissal of their claims under 26 U.S.C. § 401, 414, and for reasons set forth below, their claim under 29 U.S.C. § 1054 is also not viable. Moreover, the employees do not allege a separate violation of 29 U.S.C. § 1104(a)(1)(A) but appear to make that provision part and parcel of the partial termination claim. Thus, the partial termination claim is the sole remaining basis for a fiduciary claim and we address the statute of limitations question accordingly.

■ The 1984 failure to vest fully the accrued benefits upon partial termination of a plan could constitute a violation of 26 U.S.C. § 411(d)(3), and fiduciaries responsible for that amendment might be responsible for the violation under a breach of fiduciary duty theory. Section 1113(1)'s six-year limitations period would run from the date of the amendment's adoption.[7] A participant's actual knowledge of the amendment and its effect, however, cannot be deemed actual knowledge of each of the elements of a violation of a technical provision of ERISA, especially when the amendment disguises a failure to vest by preserving the benefit at issue, in this case the residual.

---

6. For support, the court cited the case of *United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). Even in declining to hold that a medical malpractice plaintiff's claim "accrues" only after the plaintiff becomes aware that his injury was negligently inflicted, *id.* at 123, 100 S.Ct. at 360, the Court still spoke of the

awareness of "essential facts" of an injury and its cause. A plaintiff must know of an injury before he may have actual knowledge of a breach of a duty.

7. We note that occasionally the adoption of an amendment occurs *after* its effective date.

This is particularly true where, as in this case, the company literature distributed to employees at the time of the amendments described them as improving participants' benefit packages. It is not disputed that employees were informed that the residual would be retained for those who transferred to the BEST and that the amendments were "a major addition" to benefits. *See supra* part I (quoting company literature). For a participant to have discerned a cause of action for partial termination at that time and under these circumstances, may have required a review of the plan document and of the plan's balance sheet—in short, a level of research and scrutiny inconsistent with section 1113's actual knowledge standard.

If the 1984 transfer of assets to a new plan did impermissibly decrease benefits, and if the 1984 amendment did wrongfully channel funds from the plan to the company, then, absent fraud or concealment, the six-year limitations period would have begun to run at the time the 1984 amendment was adopted. The three-year limitations period would run only from the time an employee actually knew of the violation. That actual knowledge cannot always be implied from mere knowledge of the changes to the plan.

Because the district court located both the possible violations of ERISA and the employees' actual knowledge of them in the 1984 amendments alone, we will reverse the dismissal of the employees' fiduciary claims and remand for a finding of the date when each employee had actual knowledge of all material facts relevant to a partial termination claim.

Additionally, we note that in 1984 the limitations period in section 1113 contained a constructive knowledge clause. *See* 29 U.S.C. § 1113(a)(2)(B) (repealed). On remand the parties should address this sec-

tion and its possible application, and whether its application has been waived for the defendants' failure to assert it.

### III.

### *The Non–Fiduciary Claims*

Although ERISA provides a specific limitations period for breaches of fiduciary obligations, the Act does not set any limitations period for non-fiduciary claims brought pursuant to its civil enforcement provision, 29 U.S.C. § 1132. As a general rule, when Congress omits a statute of limitations for a federal cause of action, courts " 'borrow' the local time limitation most analogous to the case at hand." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* —— U.S. ——, 111 S.Ct. 2773, 2778, 115 L.Ed.2d 321 (1991). In the absence of an applicable ERISA limitation, the courts thus apply the statute of limitations for the state claim most analogous to the ERISA claim pursued. *See, e.g., Vernau v. Vic's Market, Inc.,* 896 F.2d 43, 45 (3d Cir.1990).

If a statute of limitations of a state other than the forum state were implicated in the litigation of a federal claim, then federal, not state, choice of law principles would govern. *See, e.g., Champion Int'l Corp. v. United Paperworkers Int'l Union,* 779 F.2d 328, 332–34 (6th Cir.1985).[8] Here the employees ask that we apply Michigan's six-year statute of limitations by invoking the plans' choice of Michigan law provisions, and by pointing to Burroughs's substantial contacts with Michigan. We find that neither the choice of law provision nor the state contacts sufficient to implicate Michigan's statute of limitations.

Choice of law provisions in contracts do not apply to statutes of limitations, unless the reference is express. *See*

---

8. The teaching of *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), requires application of a forum state's choice of law principles in diversity cases, *id.,* and with respect to pendent state law claims, *see System Operations, Inc. v. Scientific Games Dev. Corp.,* 555 F.2d 1131, 1136 (3d Cir. 1977), but the concern at work in *Klaxon* and

*System Operations*—the protection of a state's interest in the proper application of its law—is not a concern when federal law is applied. A state court or legislature does not necessarily seek to further or even consider federal laws when it develops its choice of law provisions. A federal choice of law rule would address those concerns.

*Federal Deposit Ins. Corp. v. Peterson,* 770 F.2d 141, 142 (10th Cir.1985); *Des Brisay v. Goldfield Corp.,* 637 F.2d 680, 682 (9th Cir.1981).[9] Nor do Burroughs's contacts with Michigan require application of the Michigan statute of limitations. While those contacts might prompt a state court to balance different states' interests in the application of their laws, the employees have not articulated any reason why a federal court applying a federal statute should engage in interest analysis.[10]

Because Michigan's statutes of limitations do not apply here, we follow the general rule and borrow a limitations period applicable to the forum state claim most analogous to the ERISA claim at hand. We therefore proceed to a determination of the most analogous Pennsylvania claim for each of the claims asserted here.

### IV.

In determining the most analogous Pennsylvania claims, we note at the outset of our analysis that where the ERISA claims asserted differ from those presented in *Vernau v. Vic's Mkt., Inc.,* 896 F.2d 43, 45 (3d Cir.1990), and *Teamsters Pension Trust Fund v. John Tinney Delivery Serv., Inc.,* 732 F.2d 319, 322 (3d Cir.1984), we should not rotely apply the same limitations period applied first in *Tinney* and then in *Vernau.* In *Tinney,* a suit to recover unpaid benefits brought under the federal Labor Management Relations Act, rather than ERISA, we employed the statute of limitations from Pennsylvania's Wage Payment and Collection Law, 43 Pa. Stat.Ann. § 260.9a(g) (Purdon Supp.1989). 732 F.2d at 322–23. In *Vernau,* a suit to recover past due employer contributions under both the Labor Management Relations Act and ERISA,[11] we concluded that the action was essentially the same under both acts and again borrowed the Wage Payment and Collection Law's limitation on actions. 896 F.2d at 45.

The Wage Payment and Collection Law's limitation provides:

> No administrative proceedings or legal action shall be instituted under provisions of this act for the collection of unpaid wages or liquidated damages more than three years after the day on which such wages were due and payable as provided in sections 3 and 5.

43 Pa.Stat.Ann. § 260.9a(g). The sections 3 and 5 referred to provide that wages are due on regular paydays, or, in the event of termination, on the payday next following. *See* 43 Pa.Stat.Ann. §§ 260.3, 260.5.

The claim for past due wages governed by section 260.9a(g) is not analogous to a claim founded on ERISA violations or a claim for benefits not yet due. An employer's delinquency or an employee's receipt

---

**9.** Although the employees are correct in asserting that statutes of limitations are deemed "substantive law" for purposes of the *Erie* doctrine, *see, e.g., Ciccarelli v. Carey Canadian Mines, Ltd.,* 757 F.2d 548, 552 (3d Cir.1985) (applying state statute of limitations in diversity according to *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)), this does not mean that they are "substantive" for purposes of choice of law provisions.

 Because none of the plans explicitly designates Michigan's statutes of limitations as applicable, we need not decide whether an express designation would be enforceable.

**10.** It is possible that Congress's omission of a statute of limitations reflects a federal interest in allowing each state to determine for itself the time within which its citizens and the litigants in its courts may bring suit under ERISA. *Cf.* 29 U.S.C. § 1132(e)(1) (granting state courts concurrent jurisdiction over some ERISA actions). Even were that so, the named plaintiffs

in this case are all Pennsylvania residents and we cannot discern that a federal policy would be advanced by applying Michigan's statute of limitations to them.

 The employees also advance policy arguments. First, Michigan's longer statute of limitations resembles ERISA's six-year limitation on fiduciary actions (a limitation that does not apply to these claims). Second, Michigan's limitation period would have applied if the employees had brought suit in Michigan, and failure to apply it here would encourage forum shopping among states with different limitations. These considerations are irrelevant to federal policy because (1) Congress could have expressly created a limitation that *does* apply, and because (2) its failure to do so evidences a disinterest in preventing the sort of forum shopping to which the employees allude.

**11.** *See* 29 U.S.C. § 1145 (delinquent contributions), pursuant to which the plan sued the employer in *Vernau,* 896 F.2d at 44.

of diminished payment gives immediate, obvious notice to an employee that something is amiss, but an ERISA violation or a reduction in future benefits may be subtle and will go unnoticed far more often than delinquency. Furthermore, the analogy in *Vernau* between the "wages" covered by Pennsylvania law and the delinquent employer contributions—which had been collectively bargained for—becomes inoperable when ERISA claims are based on statutory violations, plan interpretation and future benefits.

Even if we were to ignore differences in notice and to include statutory violations and future benefits under the rubric of "wages," we still would not apply the Wage Payment and Collection Law limit because it provides no period of repose to an employer in the case of future benefits. A claim for an ERISA violation affecting the retirement benefit of a twenty-year old employee might accrue 45 years later, when the benefit would be "due and payable." Although the doctrine of laches might preclude the action, we are unwilling to open the door to a 48–year limitations period.[12]

A claim for breach of contract is analogous to some of the claims presented here for benefits under a plan, but only with respect to those benefits that were bargained for. Pennsylvania's four-year limitation on breach of contracts, 42 Pa.Stat. Ann. § 5525, reflects the state's "judgment on the proper balance between the policies of repose and the substantive policies of enforcement." *Wilson v. Garcia*, 471 U.S. 261, 271, 105 S.Ct. 1938, 1944, 85 L.Ed.2d 254 (1985). An important assumption underlying that judgment must be that a party who has bargained for some benefit will, or ought to, know his rights, and will immediately recognize any breach thereof. When an ERISA claim resembles a contract action, it is appropriate to adopt the state's judgment as to how long the party

ought to have to bring suit, a judgment inherent in its statute of limitations for contract claims.

An ERISA claim, however, may not resemble either a claim for past due wages or a contract claim. Such is the case when benefits are neither delinquent nor bargained for. In this situation, Pennsylvania has no analogous law, and the "most appropriate," *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975), state statute of limitations is found at 42 Pa. Cons.Stat.Ann. § 5527 (Purdon Supp.1991):

> Any civil action or proceeding which is neither subject to another limitation specified in this subchapter nor excluded from the application of a period of limitation by section 5531 (relating to no limitation) must be commenced within six years.

In summary, when ERISA does not provide an applicable statute of limitations and the most appropriate limitations period of Pennsylvania is borrowed, the following limitations periods apply. First, claims for delinquent employer contributions or for payments past due that are most analogous to claims under the Wage Payment and Collection Law are governed by its three-year limitation, and measured from the date the delinquent payment was due. Second, claims to recover benefits that were bargained for but have not yet become payable most closely resemble contract claims for anticipatory breach, and are governed by Pennsylvania's four-year statute of limitations measured from the time when a claimant first knows that the benefit has been infringed or removed. Third, other ERISA claims, such as those seeking to reinstate an improperly removed non-bargained-for benefit or to avoid a prohibited transaction, have no counterpart in Pennsylvania law and are thus governed by Pennsylvania's general six-year statute of limitations.[13]

---

12. Our recent decision in *Sheet Metal Workers, Local 19 v. 2300 Group, Inc.*, 949 F.2d 1274 (3d Cir., 1991) (borrowing and applying Pennsylvania tolling principles to the three-year statute of limitations on a claim for delinquent employer contributions), is not to the contrary.

13. Judge Alito reaches the same conclusion on grounds that an ERISA suit by a beneficiary to enforce a plan is analogous to a suit by a trust beneficiary against the trust or settlor. *See Nedd v. United Mine Workers of America*, 556 F.2d 190, 207 (3d Cir.1977). Since Pennsylvania

Thus, the employees' claims here for payments due prior to March 2, 1987, are time-barred because they are analogous to claims under Pennsylvania's Wage Payment and Collection Law, which bars claims not filed within three years. Claims for bargained-for benefits of which they were deprived prior to March 2, 1986, are time-barred because they resemble contracts claims barred under Pennsylvania's four-year limitation period. Any claims that accrued prior to March 2, 1984, are time-barred because Pennsylvania bars claims not covered by other limitations periods under a six-year limitations period. All other claims were timely brought under appropriate, borrowed statutes of limitations.

■ The employees' claims asserting failure to vest the residual, failure to distribute the surplus, and improper reduction of early retirement benefits are claims founded on complex issues of statutory interpretation. They are subject to Pennsylvania's six-year statute of limitations. Because they accrued at the earliest on July 1, 1984—the effective date of the amendment—they have been timely interposed.

■ The claim asserting rights to the bargained-for residual is a claim for breach of contract. It is subject to Pennsylvania's four-year limitation on actions for breach of a written contract. Because it accrued on notice of the residual's definite elimination—sometime in 1988, it has been timely interposed.

■ Claims for recalculation of benefits already paid are essentially claims for past due "wages." They are subject to the Pennsylvania Wage Payment and Collection Law's three-year limitation on actions for wages past due. Claims based on payments due within three years before March 2, 1990, have been timely interposed.

Although our analysis differs markedly from that of the district court, the result remains substantially the same: most of the employees' non-fiduciary claims are timely interposed.

V.

The employees sought a determination by the district court that a "partial termination" of BERIP occurred when Burroughs phased out the contributory program. ERISA requires that, for a pension plan's trust to be tax-qualified, the plan must provide

> that ... upon its termination or partial termination ... the rights of affected employees to benefits accrued to the date of such termination, [or] partial termination, ... to the extent funded as of such date, or the amounts credited to the employees' accounts, are nonforfeitable.

26 U.S.C. § 411(d)(3). Because BERIP contained a "partial termination" clause, the employees argue that the termination of the contributory program was a partial termination, entitling them to vested rights to the accrued residual, surplus allocable to it, and contributory early retirement benefits. We examine the claim that a partial termination did occur.

Although ERISA does not define "partial termination," *see Weil v. Retirement Plan Admin. Comm.*, 750 F.2d 10, 12 (2d Cir. 1984), we have recognized that the vesting requirement of section 411 helps to ensure that employees get their expected benefits. *See United Steelworkers of America v. Harris & Sons Steel Co.*, 706 F.2d 1289, 1298 (3d Cir.1983). Without this vesting requirement, an employer could first build up income tax-free by making deductible contributions to a pension trust, then recoup those contributions by terminating the plan or by partially terminating the plan to reduce the trust's expected liability. *See id.; In re Gulf Pension Litigation*, 764 F.Supp. 1149, 1162 (S.D.Tex.1991).

In *Harris & Sons Steel*, we opined:

> Rules governing the effect of a "partial termination" in the tax sense serve the purpose of helping to ensure that employees will not be deprived of their

would apply the doctrine of laches (informed by the six-year statute) to such a suit in equity, *see Truver v. Kennedy*, 425 Pa. 294, 229 A.2d 468,

475–76 (1967); *DiLucia v. Clements*, 373 Pa.Super. 466, 541 A.2d 765, 768 (1988), Judge Alito would apply the six-year statute here.

anticipated benefits. These rules also deter employers from arbitrarily cutting groups of workers out of existing pension plans. It would seem that the employer could realize a windfall if it could, through the discharge of a substantial portion of plan participants, cause a larger number of employees to forfeit their pension benefits than would be anticipated under actuarial formulas.

706 F.2d at 1298 (citations and footnote omitted). *See also Chait v. Bernstein,* 835 F.2d 1017, 1021 (3d Cir.1987) (citing *Harris & Sons Steel:* section 411 "protect[s] the anticipated benefits eliminated by sudden changes in the plan").

 Partial termination thus involves a significant reduction in plan liability by means of a corresponding reduction in employee benefits. That reduction may be achieved either by excluding a segment of employees, or by reducing benefits generally. The former reduction, the exclusion of participants, is referred to as a "vertical reduction," *see* Stuart M. Lewis, *Partial Terminations of Qualified Retirement Plans—An Evolving Doctrine,* 13 Comp. Plan J. (BNA) 223 (1985), and may result in a "vertical partial termination," *see In re Gulf Pension Litigation,* 764 F.Supp. at 1162. A vertical partial termination may result from events such as mass firing or lay-offs due to closing divisions or moving plants, *see Harris & Sons Steel,* 706 F.2d at 1291–92 (plant closing), or other employee "turnover", *see* Stuart M. Lewis, *supra,* at 224–26. The latter reduction—the reduction of benefits generally—is referred to as a "horizontal reduction," *see* Stuart M. Lewis, *supra,* at 223, and may result in a "horizontal partial termination," *see In re Gulf Pension,* 764 F.Supp. at 1172–79. Cases involving horizontal partial terminations are rare. *See* Stuart M. Lewis, *supra,* at 227.

 Because vertical partial terminations frequently involve some form of employee turnover, the level of employee turnover necessary to constitute a partial termination is often litigated—with various revenue rulings and court opinions espousing either a "significant number" or "sig-nificant percent" test. *See In re Gulf Pension,* 764 F.Supp. at 1163–64 (citing revenue rulings and cases). In *Bruch v. Firestone Tire & Rubber Co.,* 828 F.2d 134, 150–51 (3d Cir.1987), *aff'd in part, reversed in part,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), we eschewed the "significant number/percent" approaches and insisted on a relation between the number of employees terminated and the appearance of the plan as a mechanism for deferring income, not paying benefits. *Id.* at 151. In that context, we still found it appropriate for the district court to have considered the percentage of terminated employees. *Id.*

With respect to the partial termination claim asserted here, the district court appears to have determined that because no employees were terminated, a partial termination could not have occurred. In response to the employees' argument that a partial termination might result from other benefit reductions, the district court, relying on *Bruch,* opined that it was "not bound by the § 411 standard." In *Bruch,* we rejected the plaintiffs' arguments that a vertical partial termination determination "should turn on the total number of employees affected, or the amount of money the employer saves by terminating the affected employees." 828 F.2d at 151. We wrote:

> We believe that the structure of the statute suggests that a partial termination should be found under 411(d)(3) only if so many people have been terminated that the plan appears to have been created as a mechanism for deferring the recognition of income....

*Id.* That statement must be explained in the context of that passage: our rejection of the "significant percentage" approach to vertical partial termination determinations. We did not limit partial terminations to *vertical* partial terminations. Indeed, we had previously recognized the possibility that "a mere reduction in benefits can, in some circumstances, constitute a 'partial termination.'" *Harris & Sons Steel Co.,* 706 F.2d at 1299 n. 24. We did not, in *Bruch,* expressly reject a "facts and cir-

cumstances" based approach to partial terminations. Rather, we rejected the IRS's "significant percentage" test, disagreed with the approach of the Court of Appeals for the Second Circuit in following it, and redirected the inquiry into the event claimed to have constituted a partial termination. We refocused that inquiry on the tax aspect of ERISA, and we invited Congress or the IRS to elaborate, *Bruch*, 828 F.2d at 151, an invitation which has gone unanswered.

The district court thus erred when it dismissed the partial termination claims because no employees were terminated. The district court was correct insofar as it pointed out that "we are not bound by the [IRS's] § 411 standard,"[14] but our precise statement upon which the district court relied was that "we are not bound by the § 411 standard for partial termination *in deciding when a termination occurs for ERISA purposes."* *Chait*, 835 F.2d at 1021 (emphasis added).

While we are not bound by IRS rules in determining partial terminations for ERISA purposes, and while we might not accord them the great weight or deference due agency rulings in other contexts, we are certainly obliged to consider them, especially where, as here, there is little or no guidance directly from Congress. Although we have opined, in other contexts, that a partial termination for tax purposes is not necessarily a termination or partial termination for ERISA purposes,[15] we have never held that the Treasury regulations are irrelevant.

Determinations as to whether a partial termination has occurred are made with regard to all the facts and circumstances in a particular case, Treas.Reg. § 1.411(d)–2(b)(1), or by reference to a special rule governing horizontal partial termination,

*id.* § 1.41(d)–2(b)(2). The special rule states:

> If a defined benefit plan ceases or decreases future benefit accruals under the plan, a partial termination shall be deemed to occur if, as a result of such cessation or decrease, a potential reversion to the employer, or employers, maintaining the plan (determined as of the date of such cessation or decrease is adopted) is created or increased. If no such reversion is created or increased, a partial termination shall be deemed not to occur by reason of such cessation or decrease.

Treas.Reg. § 1.411(d)–2(b)(2).

Although a partial termination for tax purposes is not always a partial termination for ERISA purposes, *see supra* note 15, the special rule does identify horizontal partial terminations for ERISA purposes, because the rule highlights the kind of employer activity that ERISA seeks to redress: manipulation of a tax-qualified trust to an employer's advantage in a way that frustrates employee expectations. The vesting requirement of section 411(d)(3) does not prohibit all such manipulations, it simply protects employees' benefits to *some degree*, i.e., accrued benefits. Congress thus struck a balance between employer flexibility and employee expectations.

In determining whether to apply the special rule, we note that its requirement of a potential reversion to an employer is consistent with the scant legislative history that exists on the subject:

> Under the conference substitute, as under present law, all accrued benefits in a qualified pension plan must become fully vested (in accordance with the rules of the bill concerning allocation of assets

---

**14.** As quoted by the district court in *Gluck v. Unisys Corp.*, No. 90–1510, at 20–21, 1991 WL 14083 (E.D.Pa. Feb. 1, 1991) (mem. op.).

**15.** *United Steelworkers of America v. Harris & Sons Steel Co.*, 706 F.2d at 1299 ("no reason to read [tax precepts governing 'partial terminations'] as stating that, when partial termination takes place for tax purposes, then a segment of the plan ... goes out of existence for

purposes of plan termination insurance"); *Bruch v. Firestone Tire & Rubber Co.*, 828 F.2d 134, 150–51 (3d Cir.1987) (citing *United Steelworkers*), *aff'd in part rev'd in part*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1988); *Chait v. Bernstein*, 835 F.2d 1017, 1020–21 (3d Cir.1987) (citing *United Steelworkers* and *Bruch*); *Ashenbaugh v. Crucible, Inc.*, 1975 Salaried Ret. P., 854 F.2d 1516, 1518 n. 1 (3d Cir.1988).

upon termination and to the extent then funded) in the event of a plan termination, or the complete discontinuance of contributions under the pension plan. Under the substitute, this rule is no longer to apply to cases where employers have not made contributions to plans under the funding requirements of the bill, because the bill reaches this problem by imposing a excise tax on underfunding. However, the rule of full immediate vesting is still to apply in the case of a termination, or partial termination of a plan.

H.R.Rep. No. 1280, 93d Cong., 2d Sess. 277 (1974). The IRS requirement of a potential reversion is in step with the House Report's statement that underfunded plans are addressed separately, because an underfunded plan is unlikely to have funds sufficient both to pay vested benefits and to provide a reversion large enough to motivate the plan's termination. When a plan is overfunded or adequately funded, however, a partial or full termination will result in a potential reversion.

To the partial termination determination, the district court should thus apply the special rule's requirements. First, the district court should determine whether the 1984 amendment resulted in a cessation or decrease of future benefit accruals. Second, the district court should determine whether as a result of any cessation or decrease in future benefit accruals a potential for reversion was created or increased.

Because a factual determination should be made by the district court, we will reverse the district court's judgment dismissing the employees' partial termination claims and remand for findings as to whether the special rule was satisfied and for any further proceedings following from those findings.

### VI.

The validity of the employees' claims based on section 204(g), 29 U.S.C. § 1054(g), to non-contributory and contributory early retirement benefits under BERIP depends solely on the actual date of adoption of the 1984 amendment. ERISA permitted the reduction of early retirement benefits prior to July 31, 1984, but not after. *See Bencivenga v. Western Pa. Teamsters & Employers Pension Fund,* 763 F.2d 574 (3d Cir.1985); Pub.L. 98–397, title III, § 302(d)(1) ("the amendments made by section 301 [amending 29 U.S.C. § 1054(g) ] shall apply to plan amendments made after July 30, 1984"). Because an ERISA plan document may not be amended informally, *see Confer v. Custom Eng'g Corp.,* 952 F.2d 41 (3d Cir.1991) (per curiam); *Hamilton v. Air Jamaica, Ltd.,* 945 F.2d 74 (3d Cir.1991), a formal amendment adopted after July 30, 1984 would be ineffective, even if dated retroactively. *See Confer* (sponsor could not amend plan retroactively to deny benefits). It appears, however, that the employees failed to raise this argument in the district court. Their complaint alleges July 1, 1984 as the effective date of amendment and is silent as to the date the amendment was adopted. The employees did not respond in their reply brief to the defendants' observation that the allegation of a retroactive amendment was raised for the first time on appeal. The employees are therefore precluded from raising the issue on appeal.[16]

According to the complaint, some early retirement benefits and vested benefit subsidies were canceled in 1988 when the amended BERIP merged into the Unisys plan. The merger is governed by section 208, 29 U.S.C. § 1058, which provides that the benefit under a new plan must equal or exceed the old benefit. The Unisys plan appears to comply with section 208 in that it allows calculation under BERIP for those whose benefit would be greater. It is not clear, however, whether these benefit cutbacks worked a partial termination, and we will remand for consideration in light of our analysis above.

### VII.

The district court correctly held there was no legal basis for the employees' claim for market rate interest on sums with-

---

**16.** We note that any fiduciary claim based on this violation fails as well.

drawn in contemplation of the termination of the contributory program. We will therefore affirm that part of the district court's judgment dismissing the claim under Rule 12(b)(6). Because the employees' other claims, variously labeled "failure to disclose" and "violation of cash-out provisions," were not raised on appeal, we do not reach their merits.

### VIII.

For the foregoing reasons, we will reverse in part, and affirm in part, the district court's judgment dismissing the plaintiffs' complaint and direct that, on remand, (1) fiduciary claims grounded on 26 U.S.C. § 411(d)(3) be reinstated pending a determination of the applicability of 29 U.S.C. § 1113(a)(2)(B) (repealed), and of plaintiffs' "actual knowledge" of an ERISA breach or violation, (2) partial termination claims be reinstated with respect to the 1984 amendment and with respect to the 1988 reductions in early retirement and vested benefit subsidies; and (3) the order of the district court dismissing the complaint is affirmed with respect to all other claims.

ALITO, Circuit Judge, concurring.

I join the opinion of the Court, but I write separately to explain my understanding of the importance of tax regulations and rulings in an ERISA case involving a partial termination claim.

Under the Internal Revenue Code, a "qualified" trust (IRC § 401) enjoys substantial tax advantages. Under IRC § 411(d)(3)(A), a trust is not "qualified" unless "the plan of which such trust is a part provides that ... upon its termination or partial termination ... the rights of all affected employees to benefits accrued to the date of such termination [or] partial termination ... to the extent funded as of such date, or the amounts credited to the employees' accounts, are nonforfeitable." "As a result of this provision, all qualifying pension plans contain the assurances required by this section. Plaintiffs can then sue on the basis of the plan language." *Bruch v. Firestone Tire and Rubber Co.,* 828 F.2d 134, 151 (3d Cir.1987), *aff'd. in*

*part, rev'd. in part,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1988). This is precisely what took place in the present case. The plan at issue—presumably for the purpose of obtaining "qualified" status and the concomitant tax advantages—contains the assurances required by IRC § 411(d)(3)(A), and the plaintiffs are suing to enforce those assurances.

Since the plaintiffs seek enforcement of a plan provision that echoes the language of and was obviously inserted to satisfy IRC § 411(d)(3), it seems clear that the term "partial termination" in the plan was meant to have the same meaning as the same term in IRC § 411(d)(3) and related tax regulations and rulings. Thus, Treas. Reg. § 1.411(d)–2(b) is fully applicable here. Furthermore, because of the Internal Revenue Service's statutory responsibilities, expertise, and experience in detecting partial terminations, an IRS determination that a partial termination has or has not occurred in a particular case, under either the "general rule" or the "special rule" (Treas.Reg. § 1.411(d)–2(b)(1) and (2)), should be accorded deference by the courts.

This approach is particularly appropriate since IRC § 411(d)(3) and Treas.Reg. § 1.411(d)–2(b)(1) provide great leeway for determinations by the Commissioner. Neither IRC § 411(d)(3) nor any other provision of the Code defines the term "partial termination," and as we noted in *Bruch,* 828 F.2d at 151:

> [I]t is not easy to define the purpose of § 411(d)(3). Without a clear sense of the provision's purpose it is difficult to decide what should and should not constitute a partial termination.

Treas.Reg. § 1.411(d)–2(b) does not fully remedy this deficiency. For example, the general rule for determining whether or not a partial termination has occurred (Treas.Reg. § 1.411(d)–2(b)(1)), provides very little concrete guidance. This provision states (emphasis added):

> Whether or not a partial termination of a qualified plan occurs (and the time of such event) *shall be determined by the Commissioner with regard to all the facts and circumstances in a particu-*

*lar case.* Such facts and circumstances include: the exclusion by reason of a plan amendment or severance by the employer, of a group of employees who have previously been covered by the plan; and plan amendments which adversely affect the rights of employees to vest in benefits under the plan.

Thus, if this provision is to be enforced, the courts must give substantial deference to the Commissioner's determination. The "special rule" (Treas.Reg. § 1.411(d)–2(b)(2), provides somewhat more concrete guidance, but the available interpretive materials leave considerable uncertainty about its application in particular cases.

I do not believe that our prior holdings support the proposition that a "partial termination" for ERISA purposes may be a broader or narrower concept than a "partial termination" for tax purposes. Rather, I believe that our prior decisions properly held only that a partial termination under IRC § 411(d)(3) is a different concept from a termination under other, unrelated ERISA provisions. *See United Steelworkers of America v. Harris and Sons Steel Co.,* 706 F.2d 1289 (3d Cir.1983) (termination under 29 U.S.C. § 1461); *Chait v. Bernstein,* 835 F.2d 1017 (3d Cir.1987) (termination under 29 U.S.C. § 1344). *See also Bruch,* 828 F.2d at 150–51 (discussing *United Steelworkers* ).