**MERRILL LYNCH, PIERCE, FENNER & SMITH INC., a corporation, Plaintiff,**

v.

**Paul T. YANG, Lina R. Yang, Defendants.**

**Paul T. YANG, Lina R. Yang, Cross–Complainants,**

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH INC., a corporation, Cross–Defendant.**

**No. CV 87–01751–AAH (Tx).**

United States District Court, C.D. California.

Jan. 6, 1988.

Maren E. Nelson, Morrison & Foerster, Los Angeles, for plaintiff, cross-defendant.

Evan J. Morris, Woodland Hills, for defendants, cross-complainants.

## DECISION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAUK, Senior District Judge.

This matter came on regularly for trial before the Court on December 16, 1987, pursuant to a Transfer Order signed December 15, 1987, transferring the matter from the calendar of the Honorable William J. Rea to the calendar of this Court.

Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"), plaintiff and cross-defendant herein, appeared by its counsel of record, Morrison & Foerster and Maren E. Nelson. Defendants and cross-claimants Paul T. Yang ("Mr. Yang") and Lina R. Yang ("the Yangs") appeared by their counsel of record, Evan J. Morris.

The Court having heard the evidence presented and the arguments of counsel, hereby makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

(1) Merrill Lynch is a broker/dealer of securities, registered to do business, and doing business in California.

(2) At all relevant times, Gary McMurrin ("Mr. McMurrin") was employed as a registered representative of Merrill Lynch.

(3) At all relevant times, Robert Solomon ("Mr. Solomon") was the Resident Vice-President of the Pasadena, California branch office of Merrill Lynch, with supervisory responsibility for the Glendale, California branch office of Merrill Lynch.

(4) On or about March 24, 1986, the Yangs, resident aliens of the United States residing in Los Angeles County, California at the time of this action, executed a written contract with Merrill Lynch, which is Exhibit 1, entitled "Standard Option Agreement", together with a Customer Agreement and Cash Management Account Agreement. Those documents both permit Merrill Lynch to liquidate the Yangs account upon failure to meet a maintenance call and provide the contractual basis for any potential recovery of attorneys' fees.

(5) On or about March 24, 1986, the Yangs opened a Cash Management Joint Account, with right of survivorship, bearing number 247–21166 ("the account") in Merrill Lynch's Glendale, California office.

(6) On or about November 18, 1986, the Yangs executed a second written contract with Merrill Lynch entitled "Standard Option Agreement", which is Exhibit 2.

(7) Mr. Yang holds a bachelors degree in economics from the University of Pennsylvania, which he received in 1978. Subsequent to his graduation from college, Mr. Yang was engaged in rather sophisticated econometrics activity for Chase Manhattan Bank in the econometrics divisions from May, 1978 to November, 1980. He also worked for Phillips Coal Company, a subsidiary of Phillips Petroleum, in Texas, for two years. While in Texas, Mr. Yang maintained an account with Shearson Lehman Company. Subsequent to his employment in Texas, Mr. Yang joined Honeywell and was first employed as its Corporate Secretary, in Jakarta, Indonesia, for two years, and then became President of its computer division, again in Jakarta, Indonesia. Thus, he is a sophisticated, intelli-

gent, college graduate, skilled in accounting and economics.

(8) After opening the account on March 24, 1986 with Merrill Lynch, Mr. Yang received a series of letters from Mr. Solomon in June, July, September, October and November, 1986 (Exhibits 3A, 3B, 3C, 3D, 3E, 3F, 3G, 3H, and 3I), which warned Mr. Yang that he was engaged in a very risky business, the buying and selling of index options. The Court finds credible Mr. Solomon's testimony that he sends letters of this type when he reviews accounts in which a client is trading in very risky securities or futures which are apt to be of no eventual gain to the person trading.

(9) Mr. Yang admitted that index options are the most volatile and speculative investment of which he knew. Mr. and Mrs. Yang also executed a document on October 20, 1986, which is Exhibit 7, which in effect thanks Merrill Lynch for bringing to their attention the concerns which Mr. Solomon had expressed in the letters making up Exhibit 3. In Exhibit 7, Mr. and Mrs. Yang stated that they were aware of all trading which had taken place, and that they were informed of the significant commissions paid to Merrill Lynch. In addition, Exhibit 7 stated that the Yangs' trades were done with their consent and prior knowledge as well as their understanding of the speculative risks involved in investments of this nature. Mr. and Mrs. Yang stated that their investment objectives had not changed, in light of the concerns of Mr. Solomon, and his desire to bring those concerns to their attention. Mr. Yang also testified that his trading was a "gamble." Therefore, the Court concludes that Mr. Yang was well aware of the risks presented by his trading activities.

(10) Prior to November, 18, 1986, Mr. Yang had engaged in extensive, profitable speculative options trading in the account, including the writing of naked call options.

(11) On November 18, 1986 Mr. Yang received a check for $70,000 from his account for deposit into an escrow opened for the purchase of a new house.

(12) Mr. Yang admitted that all transactions in the account through November 18, 1986 were authorized by him. As of the close of business on November 18, 1986, the following positions were held in the account: 40 XMI November 355 Calls; 40 XMI November 355 Puts; 20 XMI November 350 Puts. Each of these transactions was authorized by Mr. Yang.

(13) An "XMI" Option is an index option against the Major Market Index, which consists of a group of 20 stocks making up the Dow Jones Industrial Average ("DJIA"). Index options have both put and call features. A call gives the holder the theoretical right to purchase the stocks making up the index at a specified price (the "strike price"), prior to a specified date (the "expiration date"). However, unlike stock options, index options like the XMI are exercised in cash, rather than in the delivery of the stocks making up the index. The assigned writer (the person who sells or creates the option) is obligated to pay the exercising holder cash in an amount equal to the difference (expressed in dollars) between the closing level of the underlying index on the exercise date and the exercise price of the option, multipled by the index "multiplier." In addition, the short seller of an option is required to post and maintain margin with the brokerage house executing his trades.

(14) On November 19, 1986, 60 XMI November 340 Calls were sold in the account. The Court concludes that by Mr. Yang's previous instructions, including his instructions when he signed the new account documents, his instructions when he signed the October 20, 1986 letter, and orally when he was dealing with Mr. McMurrin, that this transaction was expressly and impliedly authorized by Mr. Yang, based on his expectation that the DJIA would decline. Moreover, Mr. Yang did not complain of this transaction after it was confirmed to him, and he therefore ratified the trade and waived any right to complain of it.

(15) On November 20, 1986, 20 XMI November 350 Puts and 40 XMI November 355 Puts were bought in the account and 40 November XMI 350 Calls were sold in the account. Again, the Court concludes

that these trades were in accord with Mr. Yang's instructions, implied, if not express. Moreover Mr. Yang again failed to complain of the trades after he became aware of them and he therefore both waived any claim that they were not in accordance with his instructions and ratified the trades. The trades were placed based on Mr. Yang's expectation that DJIA would decline that day. It did not.

(16) Mr. Yang and Mr. McMurrin met on the morning of November 21, 1986 at approximately 6:30 a.m., as the account then had a large unrealized loss as a result of the prior two days' trading. Moreover, the November XMI options expired after the close of the market on November 21, 1986. The positions in the account were discussed. After discussion, and after Mr. Yang told Mr. McMurrin that $300,000 had been wired to him from Indonesia, the two agreed that Mr. Yang would do what Mr. McMurrin thought best. Mr. McMurrin recommended that Mr. Yang cover his November positions and establish similar positions based on the XMI option expiring in December, 1986. The following transactions were then executed in the account: 60 XMI November 340 Calls were brought; 40 XMI November 350 Calls were bought; and 40 XMI November 355 Calls were bought. In addition, 60 XMI December 345 Calls were sold, 40 XMI December 350 Calls were sold and 40 XMI December 355 Calls were sold. This was done in hopes of recouping some of the losses in the account.

(17) Mr. Yang failed to timely pay for the transactions initiated November 21, 1986.

(18) On November 25, 1986, 40 XMI December 355 Calls were bought in the account and on November 26, 1986, 60 XMI December 345 Calls and 40 December 350 Calls were bought in the account, covering the positions established November 21, 1986.

(19) The debit balance in the account as of November 27, 1986 was $159,097.00.

(20) After the transactions in question, Mr. Yang, although fully aware of the transactions in the account due to his meetings and conversations with Mr. McMurrin and Mr. Solomon, never complained to Mr. McMurrin or Mr. Solomon or indicated that the trades were unauthorized. However, Mr. Solomon and Mr. Yang did discuss the manner in which Mr. Yang would pay the unsecured debit, and there was some discussion of the execution of a promissory note to secure the amount owed.

CONCLUSIONS OF LAW

(1) This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332(a)(1) and (2).

(2) The Yangs have breached their contracts with Merrill Lynch. Thus, the Yangs are liable to Merrill Lynch for the debit in their account, in the total amount of $159,097.00. Moreover, Merrill Lynch has established its right to recover for an open book account under California Code of Civil Procedure § 337a, and has further established causes of action for money paid, *Rains v. Arnett*, 189 Cal.App.2d 337, 344, 11 Cal.Rptr. 299, 302–303 (1961) and an account stated, *Trafton v. Youngblood*, 69 Cal.2d 17, 25, 69 Cal.Rptr. 568, 573–574, 442 P.2d 648, 653–654 (1968).

(3) Merrill Lynch is also entitled to judgment on the Yangs' counterclaim, no breach of the contract by Merrill Lynch having occurred.

(4) The Yangs ratified the transactions in the account. *Fortenberry v. Weber*, 18 Cal. App.3d 213, 225, 95 Cal.Rptr. 834, 842 (1971).

(5) The Yangs are estopped to complain of the transactions in the account. *Royal Air Properties, Inc. v. Smith*, 312 F.2d 210, 213–214 (9th Cir.1962).

(6) The Yangs waived their claim of unauthorized trading. *Id.*

(7) In the interests of justice, the Court declines to award Merrill Lynch attorneys' fees or prejudgment interest.

The foregoing, together with the oral findings of fact and conclusions of law made and entered on December 17, 1987, shall constitute the Court's Findings of Fact and Conclusions of Law. To the extent any Finding of Fact constitutes a Conclusion of Law, or any Conclusion of Law

constitutes a Finding of Fact, it shall be so considered.

LET JUDGMENT BE ENTERED ACCORDINGLY.