Howard SCHETTER, et al., Plaintiffs,

v.

PRUDENTIAL–BACHE SECURITIES INC., et al., Defendants.

Civ. No. S–85–0539–RAR.

United States District Court,
E.D. California.

April 19, 1988.

On Defendants' Motion for Attorneys' Fees
Sept. 12, 1988.

Geoffrey Burroughs, Jennifer H. Crabb, Weintraub, Genshlea, Hardy, Erich & Brown, Sacramento, Cal., for plaintiffs.

Peter R. Boutin, Robert D. DeLong, Keesal, Young & Logan, San Francisco, Cal., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SAMUEL P. KING, Senior District Judge.

This matter came on for trial before the Honorable Samuel P. King on March 1—9, 1988. Plaintiffs Howard Schetter, Frank E. Schetter and Nanci Johnston, as Trustees of the Schetter Electric Inc. Defined Benefit Plan and Trust ("Schetter Electric Plan"), filed this action against defendants Prudential–Bache Securities Inc. ("Prudential–Bache") and Jamie R. Gittins seeking approximately $200,000.00 in general damages and $5 million in punitive damages arising from the alleged mishandling of a brokerage account. Count I of the Complaint for the alleged violation of Rule 10b–5 promulgated pursuant to the Securities Exchange Act of 1934 was tried to a jury. On March 9, 1988, the jury returned a verdict in favor of defendants Prudential–Bache and Jamie R. Gittins on the Rule 10b–5 claim.

Counts II and III of the Complaint alleged violations of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, *et seq.* ("ERISA") and were tried by the Court. All other counts of the Complaint were either voluntarily dismissed by plaintiffs or were previously dismissed by the Court.

The Court, having heard the testimony of the witnesses and having considered the evidence and the arguments of counsel,

makes the following Findings of Fact and Conclusions of Law.

FINDINGS OF FACT

1. Plaintiff Howard Schetter is a retired electrical contractor who was, until January 1983, President of Schetter Electric Company ("Schetter Electric"). Howard Schetter is an experienced investor and he was and is a Trustee of the Schetter Electric Plan.

2. Plaintiff Frank Schetter, the son of Howard, has been employed by Schetter Electric since the 1970s and has been the President of Schetter Electric since January, 1983. Frank Schetter also was and is a Trustee of the Schetter Electric Plan, and was and is a Trustee of a health and welfare plan for a Sacramento area electricians' union.

3. Plaintiff Nanci Johnston, the office manager of Schetter Electric, also was a trustee of the Schetter Electric Plan beginning in approximately 1981.

4. Prior to opening the Schetter Electric Plan account at Prudential–Bache, Howard Schetter maintained a personal brokerage account at Paine Webber. While maintaining the account at Paine Webber, Howard Schetter purchased stock in a company called McKeon. Although Howard Schetter knew that McKeon stock had previously traded at a price as high as $39.00 per share, he purchased McKeon at approximately $1.00 per share and subsequently sold the stock at $3.00 per share. Howard Schetter was extremely pleased at having "tripled his money" on McKeon.

5. In or about 1977, the Schetter Electric Plan was created. At the inception of the Plan, funds were deposited in the Keystone B–4 Fund ("Keystone B–4 Fund"), a mutual fund composed of bonds. In 1978, the Schetter Electric Plan was earning a return of about 5% per year in connection with the Keystone B–4 Fund and Howard Schetter was unhappy with the return. In addition, Howard Schetter wished to have control over the investments made on behalf of the Schetter Electric Plan. For these reasons, Howard Schetter decided to seek an alternative to the Keystone B–4 Fund.

6. In December, 1978, Howard Schetter spoke with Mr. Gittins, who was then employed as a broker and assistant branch manager of Prudential–Bache's Sacramento branch office.

7. In December, 1978, Mr. Gittins met with Howard Schetter regarding the possibility of transferring the Schetter Electric Plan account from the Keystone B–4 Fund to Prudential–Bache. Howard Schetter advised Mr. Gittins that he wished to earn a substantially greater return on the Plan assets. Indeed, although the Plan then had assets of less than $50,000.00, Howard Schetter advised Mr. Gittins that he wanted the value of the plan to be $500,000.00 to $600,000.00 by the time he retired in 1983.

8. Later that month, Mr. Gittins met with Howard Schetter, Frank Schetter and Schetter Electric employee James Maines to again discuss the possibility of transferring the Plan assets from the Keystone B–4 Fund to Prudential–Bache. During the course of the meeting, Mr. Gittins presented a number of ideas for a possible portfolio to Howard Schetter, Frank Schetter and James Maines including stock in American Hoist and Derrick ("American Hoist"), APL Corporation, and Norfolk and Western Railroad. Mr. Gittins also advised the Trustees that a possible portfolio might include bonds issued by the following companies: Pacific Telephone, PG & E, Prime and Itel. The Trustees subsequently decided to purchase APL and American Hoist stock and place the remainder of the Plan's funds in Prudential–Bache's money market account. The Trustees decided not to purchase at that time any of the other stocks and bonds mentioned by Mr. Gittins.

9. From early 1979 through late 1982, Mr. Gittins met with the Trustees of the Schetter Electric Plan at Schetter Electric's offices in Sacramento approximately once every four to six weeks, and sometimes more frequently. During these meetings, Mr. Gittins would discuss, among other things, the status of the Schetter Electric Plan account, whether individual stocks and bonds in the account were increasing or decreasing in value, and possible addi-

tional investments. In connection with prospective new investments, Mr. Gittins usually would present the Trustees with Standard & Poors sheets containing information on the individual companies being considered. The information contained on the Standard & Poors sheets included, but was not limited to, the recent price of the stock or bond, the price range of the stock during the last year, dividends paid, the annual yield, the stock's ranking, recent developments involving the company, earnings during the last several years and related matters. One or more of the Trustees ordinarily would read the Standard & Poors sheets and, after one or more discussions with Mr. Gittins, a decision would be made by the Trustees regarding whether or not to purchase the subject stocks or bonds. On some occasions, the Trustees would "watch" the stock or bond for a while prior to making a decision as to whether to make a purchase. The Trustees, at various times, both accepted and rejected stocks and bonds presented to them by Mr. Gittens.

10. Following each and every transaction in the Prudential–Bache account, the Trustees received confirmation slips reflecting the transaction, the price at which the stock or bond was purchased or sold, the commission, if any, paid and the cost of, or proceeds from, the transaction. Ms. Johnston frequently would make a notation on individual confirmation slips of the net profit on transactions.

11. The Trustees received monthly statements every month reflecting the transactions in the Schetter Electric Plan account. In addition, the monthly statements contained a portfolio summary summarizing the stocks then held in the account, their then market value and the net worth of the Plan account. Howard Schetter and Ms. Johnston ordinarily closely reviewed the monthly statements on a monthly basis.

12. During the time the Schetter Electric Plan account was maintained at Prudential–Bache, Howard Schetter regularly read the *Wall Street Journal, Money Magazine,* and other financial publications.

Mr. Schetter followed the prices of the various Schetter Electric Plan investments as reported in the *Wall Street Journal* and the *Sacramento Bee.* When Howard Schetter retired in early 1983, Frank Schetter and Ms. Johnston bought him a subscription to the *Wall Street Journal.*

13. For a period of time, Ms. Johnston attempted to track the Prudential–Bache account by inputting information regarding the stocks in the Schetter Electric Plan account into a company computer. After approximately one or two months, she ceased this computer monitoring of the account because the computer was not well adapted to the task.

14. Ms. Johnston and Howard Schetter frequently called the Prudential–Bache office to obtain up-to-the-minute quotes on the prices of the stocks in the Schetter Electric Plan account. In addition, both Howard Schetter and Ms. Johnston visited the Prudential–Bache offices on a number of occasions between 1982 and 1984, and they would frequently inquire about the status of the Schetter Electric Plan account.

15. The Trustees advised Mr. Gittins that their investment objective was "long term growth." In addition, Howard Schetter, whom Mr. Gittins understood to have an 80% to 90% interest in the Schetter Electric Plan, repeatedly advised Mr. Gittins that he wanted to have 15–20% of the account invested in "little ones (stocks) like McKeon." In response to these and similar comments, Mr. Gittins presented to the Trustees certain more aggressive transactions for their consideration.

16. The Trustees purchased several stocks which were "new issues" or secondary offerings. In connection with such transactions, defendants always provided the Trustees with a prospectus which described the proposed investment. On one occasion, Howard Schetter requested that the purchase of a stock (Rusty Pelican) be cancelled after reading the prospectus.

17. During the time the Schetter Electric Plan account was maintained at Prudential–Bache, the Trustees purchased both stocks and bonds. The account was well

diversified and included issues in retailing, publishing, drugs, oil and gas, manufacturing, medicine, utilities, health care, defense, forest products, financial services, metals, brewing, entertainment, technology, waste disposal, cable TV, research and electronics. In addition, the Trustees, independent of Mr. Gittens and Prudential–Bache, made investments in two deeds of trust, including a second deed of trust on a vacation home in the Lake Tahoe area.

18. Some of the stocks recommended by Mr. Gittins to the Trustees were purchased by a Chartered Financial Analyst who purchased the same stocks for ERISA plans which he (the Chartered Financial Analyst) was managing for certain pension plan accounts.

19. While the Schetter Electric Plan account was maintained at Prudential–Bache, Howard Schetter opened a speculative commodities account at First Commodities Corporation of Boston. At the time he opened the account, he executed a document acknowledging that such trading was "risky".

20. During the time the Schetter Electric Plan account was maintained at Prudential–Bache, Howard Schetter maintained personal and IRA accounts at Prudentail–Bache as well. Howard Schetter instructed Mr. Gittins to purchase a number of the same stocks in his personal and IRA accounts as were purchased in the Plan account. In addition, Howard Schetter authorized other aggressive or speculative transactions in his personal account.

21. Frank Schetter also maintained a personal account with Prudential–Bache. There was at least one transaction in Frank Schetter's personal account which involved a stock which was also purchased in the Schetter Electric Plan account.

22. The Trustees were aware of the risks and rewards of purchasing stocks in the Schetter Electric Plan account. In addition, they personally observed the value of the Schetter Electric Pension Plan account decline from approximately $200,000.00 in January of 1981 to approximately $143,000 in June of 1982. They also observed the value of the Plan account thereafter increase to approximately $347,000 in June of 1983. Notwithstanding the substantial fluctuation in the value of the securities in the Plan account, the Trustees decided to continue to purchase and hold stocks and bonds in the Schetter Electric Plan account at Prudential–Bache.

23. In the fall of 1982, Frank Schetter made a single inquiry about the appropriateness of the investments in the Plan account after he attended a seminar in Montreal on the duties of ERISA trustees. Other than that one inquiry, Frank Schetter never questioned or complained about the appropriateness of the stocks and bonds in the Plan account. Howard Schetter occasionally expressed to Mr. Gittins concern about the fluctuations in the net equity in the Plan account but never complained about, or questioned, the appropriateness of the investments. Ms. Johnston likewise never complained about, or questioned, the appropriateness of the investments in the Plan account.

24. The Trustees knew that they controlled the Schetter Electric Plan account and that they could sell the stocks in the account at any time. Howard Schetter acknowledged that, as Trustees, they were the "bosses" of Plan account.

25. The Plan documents for the Schetter Electric Pension Plan provide, in pertinent part, as follows:

### 8.1 ESTABLISHMENT OF PLAN

The authority to control and manage the operation and administration of this Plan shall reside in the Employer, the Committee, and the Trustee, all of whom are considered fiduciaries under ERISA.

In the event that an Investment Manager should be appointed according to the procedure set forth in this article, such Investment Manager shall also be considered a fiduciary.

. . . .

(c) The Committee may delegate the power to control or manage the investment of the Trust to an Investment Manager appointed by the Committee.... Such Investment Manager, if appointed,

**1082**

must acknowledge in writing that he is a fiduciary with respect to the Trust, and shall then have the power to manage, acquire, or dispose of any asset of the Trust....

### 8.3 FIDUCIARY DUTIES

Each fiduciary shall discharge his duties with respect to this Plan solely in the interest of the Participants and Beneficiaries.... No person who is otherwise a fiduciary shall be liable for any loss or by reason of a breach, which results from such Participant's exercise of such control.

26. In or about June, 1984, the Plan documents were amended but the forgoing provisions were also contained in the 1984 Plan documents.

27. Mr. Gittens and Prudential–Bache were never appointed to control or manage the investment of the Plan assets. Moreover, defendants never acknowledged in writing that they were "investment managers" for the Schetter Electric Plan.

28. Trial was commenced on March 1, 1988, and plaintiffs rested on March 7, 1988, at which time defendants filed a motion for directed verdict. The motion was taken under submission and, following the rendering of the jury verdict on March 9, 1988, in defendants' favor on the Rule 10b–5 claim, the Court granted the motion as to Count II of the Complaint for violation of ERISA.

29. On March 10, 1988, the Court dismissed Count III of the Complaint for violation of ERISA.

30. Prudential–Bache and Mr. Gittens fulfilled any duties owing to plaintiffs. Prudential–Bache and Mr. Gittins did not breach any duties to plaintiffs, and no damages have been proven by plaintiffs to have been the result of any alleged violation of ERISA by defendants.

31. Any Conclusion of Law deemed to be a Finding of Fact is hereby incorporated into these Findings of Fact.

### CONCLUSIONS OF LAW

1. *Federal jurisdiction over the subject matter of this action, and venue, are proper.*

■■■ 2. Under the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA"), plan trustees bear the responsibility to "manage and control" plan assets. 29 U.S.C. § 1105(c)(3). Generally, fiduciary responsibilities may be allocated to persons other than named fiduciaries. 29 U.S.C. § 1105(c)(1). However, "trustee responsibilities" may not be so allocated. *Id.* Under ERISA, "trustee responsibility" is expressly defined to mean "any responsibility provided in the plan's trust instrument (if any) to manage or control the assets of the plan." 29 U.S.C. § 1105(c)(3). The Schetter Electric Plan instrument states that the power to control or manage the Plan resides in, among others, the Trustees. Therefore, the Court concludes that the Trustees, plaintiffs herein, bore the "trustee responsibility" to manage and control Plan assets. The Court also concludes that the decision to buy and sell Plan assets is a "trustee responsibility" within the meaning of 29 U.S.C. § 1105(c)(1) and (c)(3).

■■■ 3. Under ERISA, the only method for a plan trustee to delegate the "trustee responsibility" to manage and control plan assets is to appoint an "investment manager." 29 U.S.C. § 1105(c)(3). An ERISA "investment manager" is defined to mean:

[A]ny fiduciary (other than a trustee or named fiduciary, as defined in section 1102(a)(2) of this title)—

(A) who has the power to manage, acquire, or dispose of any asset of a plan;

(B) who is (i) registered as an investment adviser under the Investment Advisers Act of 1940 [15 U.S.C.A. § 80b–1 *et seq.*]; (ii) is a bank, as defined in that Act; or (iii) is an insurance company qualified to perform services described in subparagraph (A) under the laws of more than one State; and

(C) has acknowledged in writing that he is a fiduciary with respect to the plan.

29 U.S.C. § 1002(38).

4. An essential step to the appointment of an "investment manager" is that per-

son's written acknowledgment that he or she is a fiduciary with respect to the plan. 29 U.S.C. § 1002(38)(C). Plaintiffs never obtained a writing from defendants in which defendants acknowledged that they were fiduciaries with respect to the Plan. Therefore, defendants were never "investment managers" under ERISA and, for that reason, the Court has granted defendants' Motion for Directed Verdict as to Count II of the Complaint.

■ 5. Count III of the Complaint alleges that defendants breached their fiduciary duty to the Schetter Electric Plan. Mr. Gittens and Prudential–Bache were ERISA fiduciaries and owed a fiduciary duty to the Plan. 29 U.S.C. § 1002(21)(A). However, that fiduciary duty did not include the responsibility to manage and control Plan assets because defendants were never "investment managers" under ERISA. Under the circumstances of this case, defendants did not breach their fiduciary duty. Those circumstances include the following: (1) defendants' recommendations were appropriate in light of plaintiffs' articulated investment objectives, and (2) defendants fully disclosed the risks and rewards associated with each transaction in the Plan account.

6. Plaintiffs ratified the transactions in the account. *Royal Air Properties, Inc. v. Smith*, 312 F.2d 210, 213–214 (9th Cir. 1962); *Merrill Lynch, Pierce, Fenner & Smith v. Yang*, 679 F.Supp. 981 (C.D. Cal. 1988).

7. Plaintiffs are estopped to complain of the transactions in the account. *Id.*

8. Any Findings of Fact deemed to be Conclusions of Law are incorporated into these Conclusions of Law.

9. Defendants are entitled to judgment against plaintiffs, together with their costs of suit.

### ON DEFENDANTS' MOTION FOR ATTORNEYS' FEES

Defendants' Motion for Award of Attorneys' Fees to Prevailing Party pursuant to 29 U.S.C. § 1132(g) was heard by the Honorable Samuel P. King on August 15, 1988. Keesal, Young & Logan, a Professional Corporation, by Peter R. Boutin and Robert D. DeLong, appeared for defendants; Weintraub, Genshlea, Hardy, Erich & Brown, by Jennifer H. Crabb, appeared for plaintiffs.

Having carefully considered the memoranda and oral argument provided by counsel relating to this motion, including plaintiffs' objections hereto, and good cause appearing,

The Court finds that:

1. Defendants Prudential–Bache Securities Inc. and Jamie R. Gittins are entitled to an attorneys' fee award pursuant to 29 U.S.C. § 1132(g).

■ 2. Plaintiffs demonstrated bad faith in pursuing the ERISA claims against both Prudential–Bache Securities Inc. and Jamie R. Gittins. Plaintiffs' failure to adequately investigate their ERISA claims before bringing them, combined with their expert's lack of preparation, are indicia of bad faith. Furthermore, the Court finds that plaintiffs' investment manager claim was patently wrong in light of the clear language of 29 U.S.C. § 1002(38).

3. Defendants resolved a significant legal issue under ERISA; to wit, that stockbrokers executing trades on behalf of ERISA pension plans are not "investment managers" within the meaning of the ERISA statute in the absence of a signed writing in which the stockbroker acknowledges that he or she is a fiduciary with respect to the plan. Resolution of this significant legal issue justifies, in part, an award of attorneys' fees.

4. Plaintiffs failed to prevail on a single claim against these defendants. Therefore, the relative merits of the parties weighs heavily in favor of an award of attorneys' fees in favor of defendants.

5. Mr. Gittins and Prudential–Bache Securities Inc. engaged Keesal, Young & Logan to defend them in this action. Peter R. Boutin and Robert D. DeLong, of Keesal, Young & Logan, were the attorneys principally responsible for the defense.

6. Both Mr. Boutin and Mr. DeLong spent substantial time defending against plaintiffs' ERISA claims. This work con-

sisted of (1) a successful Motion for judgment on the pleadings dismissing all pendent state claims; (2) a successful Motion striking plaintiffs' jury demand to the ERISA claims; (3) substantial legal research and analysis concerning the duties and responsibilities of ERISA trustees and fiduciaries; (4) defendants' Trial Brief; (5) defendants' Reply to plaintiff's Trial Brief; (6) defendants' Memorandum re Duties of ERISA Trustees; (7) defendants' successful Motion for Directed Verdict; (8) extended analysis of suitability of Plan investments in light of the Trustees' articulated investment objectives; (9) seven days trying the ERISA claims to the Court; (10) preparation of Proposed Findings of Fact and Conclusions of law; and (11) preparation and argument of the instant Motion for Attorneys' Fees under ERISA.

7. 100 hours is a conservative estimate of the number of hours spent by Mr. Boutin defending the ERISA claims. 150 hours is a conservative estimate of the number of hours spent by Mr. DeLong defending the ERISA claims. The Court finds that the amount of time spent by both Mr. Boutin and Mr. DeLong in the defense of the ERISA claims in this action is reasonable.

8. Mr. Boutin's usual and customary billing rate is $185.00 per hour. Mr. DeLong's usual and customary billing rate is $110.00 per hour. The Court finds that these billing rates are reasonable.

9. The Court has received and reviewed the Declaration of Robert D. DeLong in Support of Motion for Award of Attorneys' Fees, including the Exhibit "A" attached thereto, setting forth an itemization of the work performed in connection with the defense of the ERISA claims. The Court finds that this itemization accurately and reasonably reflects the attorney time spent in defending the ERISA claims.

10. The Court finds that defendants' request of an award of attorneys' fees in the amount of Thirty–Five Thousand Dollars and No Cents ($35,000.00) is proper pursuant to 29 U.S.C. § 1132(g) and Local Rule 293, and is reasonable.

ACCORDINGLY, IT IS ORDERED that plaintiffs Howard Schetter, Frank Schetter and Nanci Johnston pay Thirty–Five Thousand Dollars and No Cents ($35,000.00) to defendants pursuant to 29 U.S.C. § 1132(g).