**Paul D. MEYER, M.D., Trustee for Paul D. Meyer, M.D., P.A. Money Purchase Pension Plan and Trust, et al.**

v.

**BERKSHIRE LIFE INSURANCE COMPANY**

**No. CIV. CCB–99–1432.**

United States District Court, D. Maryland.

Jan. 22, 2001.

Mark Menton Dumler, Brian C. Parker, Parker Dumler Kiely LLP, Baltimore, MD, for Plaintiffs.

Barrett W. Freedlander, Saul, Ewing, Weinberg & Green, Baltimore, MD, for Defendant.

## *MEMORANDUM*

BLAKE, District Judge.

Defendant Berkshire Life Insurance Company ("Berkshire") has moved for summary judgment on all claims brought by plaintiffs Paul D. Meyer and Jorge R. Ordonez (the "Doctors"). During the time relevant to this lawsuit, each doctor was the trustee for a Money Purchase Pension

Plan and Trust which was administered by Berkshire and designed to provide life insurance and retirement benefits for the doctor and his employees. The Doctors now claim that Berkshire mismanaged the trust funds. Accordingly, they have filed suit alleging common law claims for professional negligence, negligent misrepresentation or omission, deceit, and breach of fiduciary duty. In the alternative, they claim damages under the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA"), for breach of fiduciary duty. Now pending before this court are Berkshire's motions for summary judgment on all counts pursuant to Rule 56 of the Federal Rules of Civil Procedure. This matter has been fully briefed and no hearing is necessary. *See* Local Rule 105.6. Because those claims are preempted by ERISA, the court will grant the defendant's motions as to Counts I, II, III, and IV. Summary judgment will be denied on Count V.[1]

### STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that:

> [summary judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994). In making this determination, the evidence of the party opposing summary judgment

is to be believed and all justifiable inferences drawn in her favor. *Halperin v. Abacus Technology Corp.,* 128 F.3d 191, 196 (4th Cir.1997) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505). The non-moving party may not rest upon mere allegations or denials in her pleading, however, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Allstate Fin. Corp. v. Financorp, Inc.,* 934 F.2d 55, 58 (4th Cir.1991). Further, the "mere existence of a scintilla of evidence" to support the non-moving party's position is not sufficient to defeat a motion for summary judgment. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

### BACKGROUND

Doctors Meyer and Ordonez are neurosurgeons. In 1980, they left the practice in which they were employed and opened separate, but affiliated, practices. (Pl.s' Opp. at 3.) At that time, the Doctors placed the money they received from their pension plans on deposit at a local bank. (*Id.;* Ex. B, Ordonez Dep. at 17.) Over the next three years, the Doctors developed a relationship with the branch manager of that bank, Michael Meszaros. (Pl.s' Opp., Ex. E; Ex. A, Meyer Dep. at 20–23.) In 1983, Mr. Meszaros left the bank to work for Berkshire. At that time, he set up a meeting between himself, the Doctors, and Robert Walsh, the general agent for Berkshire in the Baltimore area. The purpose of that meeting was to acquaint the Doctors with the insurance and retirement services offered by Berkshire. (*Id.,* Ex. C, Meszaros Dep. at 76–78.) The Doctors allege that, during this meeting or one subsequent, Mr. Meszaros told them that if each invested with Berkshire, their plans would be worth more than $2,000,000

---

1. Berkshire has also filed a separate motion to dismiss or strike the claims for punitive damages in Counts III and IV of the amended complaint and the request for a jury trial. The court's finding that Counts I–IV are preempted by ERISA renders this motion moot. The plaintiffs do not seek punitive damages for the violations of ERISA alleged in Count V, and they have agreed that this claim will be decided by the court. (Pl.s' Opp. at 3.) Berkshire's motion, therefore, will be denied.

by the time they were ready to retire. (Meyer Dep. at 82–83.)

Soon thereafter, the Doctors enrolled as employers in the "Berkshire Life Pension Plan." Each set up a separate plan, named himself as Trustee, and became a participant in the plan as an employee of the practice. (Mem. Sup. Mot. for Sum. Jud. Against Meyer ("Meyer Mot.") at 2; Mem. Sup. Mot. for Sum. Jud. Against Ordonez ("Ordonez Mot.") at 2.) Each doctor employed a secretary who was also a participant in his plan. The plans required each doctor to contribute $30,000 annually for himself and a smaller amount each year for his secretary. (Meyer Mot. at 2; Ordonez Mot. at 2.) Of this amount, 25% was used as a premium on a life insurance policy and the remaining 75% was invested to provide a retirement fund. (Meyer Mot. at 2.)[2]

The plans remained in existence until at least 1996.[3] During that time, the Doctors were provided various reports and disclosures which purported to explain the status of their plans and the transactions that had been undertaken during the year. Further, the Doctors met annually with Mr. Meszaros and Mr. Walsh to discuss their plans. (Pl.s' Opp. at 12.) In addition, as trustees of their respective plans, each Doctor was required to approve and authorize all transactions that were made. (Meyer Mot. at 6; Ordonez Mot. at 6.) These disclosures and approvals are the subject of significant debate. Berkshire claims they prove that the Doctors had knowledge sufficient to understand that a breach of fiduciary duty had occurred. In response, the Doctors contend that they relied almost entirely on Mr. Meszaros for investment advice. (Pl.s' Opp. at 13.) They claim to have simply "rubber-

stamped" any transactions that he recommended and not to have read carefully the reports they were sent. Indeed, they claim that they looked at the reports only long enough to make sure that the value of the plans increased each year. (Id.)

In the spring of 1996, Dr. Ordonez's secretary had a problem with a loan she had obtained from the plan through Mr. Meszaros. (Pl.s' Opp., Ex. K, Jones Aff. ¶ 3.) She contacted Mr. Meszaros and discovered that he was no longer employed by Berkshire. (Id.) Thereafter, she conveyed her concern to Dr. Ordonez, who met with Mr. Walsh and an insurance representative. (Ordonez Dep. at 35–36.) That meeting worried Dr. Ordonez, he spoke to Dr. Meyer, and the two began looking for an attorney to investigate Berkshire's management of the pension funds. (Id. at 36–37.)

That investigation led to the filing of this lawsuit in which the Doctors allege that Berkshire, through Mr. Meszaros and Mr. Walsh, mismanaged their pension funds. Specifically, they contend that "Meszaros provided grossly incompetent advice and defrauded the Plans by engaging in an investment strategy that significantly reduced the Plans' investment earnings." (Pl.s' Opp. at 9.) The Doctors claim that the mismanagement falls into two categories. First, they allege that Berkshire "churned" the plans' assets to produce commissions. (Pl.s' Opp. at 10.) That is, they claim that Meszaros traded among several investments unnecessarily in order to garner the commission that accompanies each transaction. Second, the Doctors contend that Berkshire did not keep the plans appropriately diversified. (Id. at 11.) In response, Berkshire argues that the common law claims are preempted by

---

2. The Doctors contend that Berkshire was primarily a life insurance company and that it used the pension plan as a way to lure customers to sign up for the life insurance policies that it offered. (Pl.s' Opp. at 4 n.2.; Meszaros Dep. at 83–88.)

3. For reasons unrelated to this case, Dr. Ordonez changed his plan in 1994 to one that did not require an annual payment outside the life insurance premium. (Ordonez Mot. at 3.) There are no records offered for either plan for the years after 1996, but no specific information is provided regarding their termination.

ERISA and that the ERISA claim is barred either by the statute of limitations or the Doctors' contributory negligence. It has also raised ratification, waiver, and estoppel as defenses.

## ANALYSIS

### I. Counts I–IV: Preemption of Common Law Claims

In the first four counts of their complaint the Doctors assert common law claims for professional negligence, negligent misrepresentation or omission, deceit, and breach of fiduciary duty. (Compl.¶ 44–71.) Berkshire contends that these claims are preempted by ERISA. (Meyer Mot. at 38–39.)

■ Section 514(a) of ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). The Supreme Court has held that the phrase "relates to" is "expansive" and "broad." *See New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655, 115 S.Ct. 1671, 1677, 131 L.Ed.2d 695 (1995); *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739, 105 S.Ct. 2380, 2388, 85 L.Ed.2d 728 (1985); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2899–2900, 77 L.Ed.2d 490 (1983). Importantly, "ERISA clearly preempts ... claims alleging improper administration of the Plan." *All Risks, Ltd. v. Equitable Life Assurance Society*, 931 F.Supp. 409, 414 (D.Md.1996).

■ It is undisputed that the pension plans acquired by the Doctors are qualified plans under ERISA. Initially, however, the parties disagreed as to whether Berkshire was an ERISA fiduciary. Berkshire argued that the Doctors' common law claims were preempted by ERISA and that it was not liable under ERISA because it was not a fiduciary. In response, the Doctors contended that Berkshire could not have it both ways: either Berkshire was a fiduciary and could be sued under ERISA, or it was not a fiduciary, and ERISA, therefore, did not preempt their common law claims. In its reply to the Doctors' opposition, Berkshire rendered evaluation of that issue unnecessary by conceding that it was an ERISA fiduciary. (Def.'s Reply at 2.)

At heart, the Doctors allege mismanagement of their pension fund. Such claims fall directly under the purview of ERISA's preemption provision. *See All Risks*, 931 F.Supp. at 413–14; *Elmore v. Cone Mills Corp.*, 23 F.3d 855, 863 (4th Cir.1994) ("claims for breach of contract, fraud, unjust enrichment, breach of fiduciary duty, negligence, [and] accounting ... 'relate to' an ERISA-covered plan ... [and] are preempted."). Thus, because Berkshire has conceded to being a fiduciary and because the Doctors' common law claims "relate to" an employee benefit plan, the allegations of professional negligence, negligent misrepresentation, deceit, and breach of fiduciary duty are preempted by ERISA. For that reason, Berkshire's motions for summary judgment as to Counts I, II, III, and IV of the Doctors' amended complaint will be granted.

### II. Count V: ERISA

In its motion, Berkshire presents three grounds on which it argues summary judgment should be granted on the Doctors' ERISA claim. First, it contends that the claim is barred by the statute of limitations. Second, Berkshire argues that the Doctors' negligence bars recovery. Finally, the company raises ratification, waiver, and estoppel as equitable defenses. The Doctors dispute each of these contentions; they will be examined in turn.

### The Statute of Limitations

> ERISA section 113 provides that [n]o action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation ... after the earlier of - (1) six years after "... the date of the last action which constituted a part of

the breach or violation . . ., or (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation . . . ."

29 U.S.C. § 1113. Cases involving "fraud or concealment" are exempt from this provision and may be filed up to six years after the violation is discovered. *Id.*[4]

Although this provision has been interpreted by several Courts of Appeal, it has not yet been the subject of an opinion in the Fourth Circuit. An analytic framework, however, has been developed by other circuits. The first step in the analysis is to "isolate and define the underlying violation." *Meagher v. International Ass'n of Machinists and Aerospace Workers Pension Plan,* 856 F.2d 1418, 1422 (9th Cir.1988). Once it has been identified, the court must determine, first, when the breach or violation occurred and, second, when the plaintiff had actual knowledge of it. *See Ziegler v. Connecticut Gen. Life Ins. Co.,* 916 F.2d 548, 550 (9th Cir.1990). *See also Maher v. Strachan Shipping Co.,* 68 F.3d 951, 954 (5th Cir.1995) ("The statute specifies a two-step analysis of accrual of an ERISA action: first, when did the alleged breach or violation occur; and second, when did the plaintiff have actual knowledge of the breach or violation?") (citing *Ziegler,* 916 F.2d at 550.); *Gluck v. Unisys Corp.,* 960 F.2d 1168, 1178 (3rd Cir.1992) (stating that once the breach has been identified, "[t]wo temporal determi-nations must then be made: the date of the last action which formed a part of the breach and the date of the plaintiff's actual knowledge of the breach.") (citation omitted).

In their complaint, the Doctors allege that Berkshire breached its fiduciary duty by failing to act "solely in the interest of the participants and beneficiaries of the Plans," by not exercising the required prudence in investing, and by "failing to diversify the investments of the plan." (Compl.¶ 76.) In their reply to Berkshire's motions for summary judgment, the Doctors refine these allegations by dividing "[t]he conduct that caused the exceptional shortfall in earnings . . . into two general categories." (Pl.s' Opp. at 10.) First, they allege that Berkshire, through the actions of Mr. Meszaros, "churned" the plans' investments by making unnecessary trades and withdrawals so as to produce commissions. Specifically, the Doctors contend that Mr. Meszaros traded between annuity contracts. They argue that annuities are designed to be "long term, stable investments," and that, by moving money between the annuity fund and removing ten percent of the annuities annually, Meszaros breached the fiduciary duty he owed to the Doctors to invest prudently. (Pl.s' Opp. at 10–11.)[5]

Second, the Doctors argue that Berkshire breached its fiduciary duty by failing to appropriately diversify the investments.

**4.** Before 1987, ERISA also contained a constructive knowledge provision. The statute of limitations began to run when the plaintiff obtained actual knowledge or on the date "on which a report from which he could reasonably be expected to have obtained knowledge of such breach or violation was filed with the Secretary." 29 U.S.C.A. § 1113(a)(2)(B) (West 1985). Although the constructive knowledge standard was eliminated when ERISA was amended in 1987, it still applies to reports filed before that date. *See Martin v. Consultants & Administrators, Inc.,* 966 F.2d 1078, 1086 n. 8 (7th Cir.1992) (stating that before it was amended in 1987, § 1113 contained a constructive knowledge provision); *Martin v. Murphy,* 815 F.Supp. 1451, 1453 (S.D.Fla.1993) ("prior to 1987" the stat-ute of limitations applied to either actual or constructive knowledge). There is no contention in this case that the statute of limitations was triggered by the Doctors' constructive knowledge.

**5.** The Doctors also contend that Mr. Meszaros misled them and concealed information relevant to the investments. Specifically, the Doctors argue that Mr. Meszaros did not disclose the fees and penalties that would be incurred by transferring the funds. (Pl.s Reply at 11.) These actions might be subject to the six-year "fraud or concealment" statute of limitations rather than the three-year provision. 29 U.S.C. § 1113. Neither side, however, raises that issue.

Specifically, they allege that, rather than invest the plan funds in a diverse portfolio, Mr. Meszaros "loaded the plans with low yield, high fee annuities." (*Id.* at 11.) This lack of diversification, the Doctors argue, cost the plans millions of dollars.

The next step in the analysis, determining when the breach occurred, is not as simple in this case. Neither churning nor lack of diversification is a discrete breach that easily could be limited to a specific time. Rather, each involves a series of transactions that, taken together, may constitute a breach. At this stage of the case, there has been no argument about when the transactions amounted to churning or at what point the portfolio was insufficiently diversified. Rather, both sides have focused on the next analytical step: determining when the Doctors had actual knowledge of the breaches they allege.

The parties dedicate significant portions of their memoranda to detailing the communications between Mr. Meszaros, Mr. Walsh, and the Doctors ·in an effort to explain what the Doctors knew and when they knew it.[6] It is undisputed that the Doctors were sent documents each year that purported to explain the status of the plans and the transactions that had been undertaken. In the memoranda supporting its motions for summary judgment, Berkshire explains these reporting procedures and summarizes the documents that should have been sent to the Doctors. (*See* Meyer Mot. at 9–26.) It states that there were three phases to the annual reporting process and that certain documents were used during each stage. Dur-

ing the first phase, Mr. Meszaros obtained information from the Doctors' accountant, Helen Stepanek, and filled out a form called a Request for Information. He also prepared a Statement of Account, which shows the history of the Berkshire Annuity only. (*Id.* at 10.)

During the second phase, Mr. Meszaros prepared a Schedule of Accounts Allocations, a Certificate of Participation, a Form 5500, a Summary Annual Report, and a Defined Contribution Plan Analysis. (*Id.* at 12–14.) During the final phase, Employee Record Sheets were produced for each participant. (*Id.* at 14–16.) The contents and descriptions of these various forms are laid out in the memoranda.

The Doctors dispute the fact that there were three phases to the information disclosures. Rather, they claim that the entire interaction consisted of Mr. Meszaros obtaining the information from their accountant and then, with Mr. Walsh, holding an annual meeting with them. (Pl.s' Opp. at 12–13.) The Doctors contend that these meetings were brief, that the Berkshire representatives always told them that the plans were increasing in value, and that they only glanced at any documents shown to them. (*Id.* at 13.)

Further, the Doctors contend that they did not receive many of the documents on which Berkshire relies to establish actual knowledge. Indeed, they have submitted affidavits from their respective secretaries stating that they do not recognize the documents entitled "Schedule of Account Allocations, Group Annuity Statement of Account, Flexible Premium Annuity State-

---

**6.** This lawsuit was filed on April 27, 1999; thus the relevant inquiry relates to the Doctors' knowledge as of three years prior to that date, or April 27, 1996. Berkshire's observation that the amended complaint, which introduced the ERISA claim, was not filed until December 2, 1999, (Meyer Mot. at 4), is not relevant to this determination. *See* Fed. R.Civ.P. 15(c)(2) ("An amendment of a pleading relates back to the date of the original pleading when ... the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set

forth or attempted to be set forth in the original pleading ....").

Relatedly, Berkshire asserts that "Plaintiffs are absolutely barred from recovering for any losses sustained prior to December 2, 1993, six years before filing the Amended Complaint." (Def.'s Reply at 25.) Berkshire does not, however, cite to any case law supporting this assertion, and the issue was not addressed in the plaintiffs' opposition. Accordingly, this opinion does not decide the extent of any possible damages.

ment of Account, Schedule of Accounts Allocations, Investment Account Analysis, Request for Information, Defined Contribution Plans Analysis." (Pl.s' Opp., Ex. K–L, Jones and Shanahan Aff's.)[7] They do not deny receiving the Certificate of Participation, Form 5500, or Summary Annual Report.[8] In response, Berkshire claims that, even if they were not received, those documents are not necessary to establish actual knowledge. (Def.'s Reply at 19.)

The annual reports sent to the Doctors coupled with the fact that each doctor had to approve the transactions suggested by Mr. Meszaros form the basis for Berkshire's argument that the Doctors had actual knowledge before 1996 of the breaches they allege. The Doctors argue that they did not receive many of the documents, that they paid minimal attention to those that they did receive, and that they simply "rubber-stamped" the transactions suggested by Mr. Meszaros. Indeed, they contend that because the reports shown to them by Mr. Meszaros and Mr. Walsh indicated that the plans were increasing in value, they had no reason to question the investment tactics being employed. Thus, they entrusted the investments to Mr. Meszaros and did not know that anything

might be wrong until they began investigating in 1996.

The question confronting the court is whether the documents provided to the Doctors and their acquiescence to the transactions are sufficient to establish actual knowledge for purposes of ERISA § 1113. Although the Fourth Circuit has not provided an interpretation of the actual knowledge standard, the courts of appeal that have faced the issue are in fairly close accord. First, the courts are adamant that § 1113 requires actual, not constructive knowledge. *See, e.g., Gluck v. Unisys Corp.*, 960 F.2d 1168, 1176 (3rd Cir.1992) ("Of course, a plaintiff may have constructive knowledge of a breach before he actually knows of the breach, but section 1113 calls for actual knowledge."); *Radiology Center, S.C. v. Stifel, Nicolaus & Co.*, 919 F.2d 1216, 1222–23 (7th Cir. 1990) (finding that district court erred in using either constructive or actual knowledge because § 1113 requires actual knowledge).

In addition, the Third Circuit has explained that "ERISA requires actual knowledge of all of the elements of the violation alleged ...." *Gluck*, 960 F.2d at 1176 ("Section 1113 sets a high standard for barring claims against fiduciaries prior to the expiration of the section's six-year

---

**7.** These statements appear to be refuted, at least in part, by the documents produced. In its memoranda, Berkshire has designated the documents that it received from the Doctors' secretaries with the initials "M/O." There are several documents designated "M/O" that are of the types that the secretaries claim not to have seen. For example, Ms. Jones says that she did not see a form called "Defined Contribution Plan Analysis." There is, however, a form with that title, marked M/O in the 1992 reports. (Mem. Sup. Mot for Sum. Jud. against Meyer, Ex. 10 at 10–E.) Thus, it is unclear if the Doctors dispute receiving any forms of that type or claim not to have received them in certain years. Also, Dr. Meyer admitted to having received several of the documents. (Def.'s Reply at 19–20.)

Further complicating matters, however, is the Doctors' contention that they began assembling records after 1996. Once they realized that their money was being mismanaged, their accountant, Ms. Stepanek, wrote to

Berkshire and requested documentation related to their plans. (Pl.s' Opp., Ex. I.) In response, Berkshire wrote to the Doctors' lawyer and stated that "on July 22, 1998, all pertinent information we had on file including whatever 5500 reports and group annuity statements were sent to ... the plan's accountant." (*Id.*, Ex. J.) Thus, the Doctors claim that they may have actually received many of the documents marked "M/O" after 1996. (Pl.s' Opp. at 14.)

**8.** In addition, there is some dispute about documents that either are missing or not kept by the Doctors. (Pl.s' Opp. at 14–16; Meyer Mot. at 11.) A cursory review of the exhibits attached to the motions for summary judgment reveals that not all of the same forms are provided for each year. The missing documents have not been located either by the Doctors or Berkshire. (Meyer Mot. at 11–16.)

limitations period.") Thus, "a plaintiff [must] have actual knowledge of all material facts necessary to understand that a claim exists." *Id.* at 1177. However, "not all ERISA actions for breach of fiduciary duties require an occurrence of harm before they will accrue." *Ziegler v. Connecticut Gen. Life Ins. Co.*, 916 F.2d 548, 550 (9th Cir.1990). Rather, harm is relevant when "the circumstances may shed light on when [the plaintiff] gained actual knowledge of the alleged breach or violation." *Id.* at 552.

Beyond these rules, however, the analyses become very case-specific. Indeed, "[t]his inquiry into plaintiffs' actual knowledge is entirely factual, requiring examination of the record." *Id.* In its reply, Berkshire has attempted to draw a bright line distinction among the circuit court opinions on this issue. It contends that the Third and Fifth Circuits adhere to the standard explained in *Gluck*, and require knowledge that a fiduciary duty has been violated. Berkshire argues that, in the Seventh and Ninth Circuits, on the other hand, simple knowledge of the transaction is sufficient to trigger the statute of limitations. (Def.'s Reply at 14–15.) An examination of the cases, however, indicates that this distinction is not entirely appropriate. Certainly, the Third and Fifth Circuits are in agreement, and both have held that knowledge of a transaction or series of transactions, by itself, is insufficient to establish actual knowledge. *See, e.g., Maher*, 68 F.3d at 954, 956 (adopting the Third Circuit standard and rejecting the argument "that knowledge of the transaction, i.e. the purchase of Executive Life Annuities, is enough by itself to trigger the three-year statute of limitations."). *See also Babcock v. Hartmarx Corp.*, 182 F.3d 336, 340 (5th Cir.1999) ("our precedent requires more than knowledge of the material facts; it requires knowledge that the facts support a claim under ERISA."); *Gluck*, 960 F.2d at 1178 ("We disagree that mere knowledge of a transaction is always enough. 'Actual knowledge of a breach or violation' requires knowledge of all relevant facts at least sufficient to give the plaintiff knowledge that a fiduciary duty has been breached or ERISA provision violated.").

In drawing the distinction between these cases and those from the Seventh and Ninth Circuits, Berkshire relies on *Martin v. Consultants & Administrators, Inc.*, 966 F.2d 1078 (7th Cir.1992). In that case, the court wrote that

> [a]t the same time, the relevant knowledge for triggering the statute of limitations is knowledge of the facts or transaction that constituted the alleged violation. Consequently, it is not necessary for a potential plaintiff to have knowledge of every last detail of a transaction, or knowledge of its illegality.... Suffice it to say that to have actual knowledge of a violation to trigger ERISA's three-year statute of limitations, a plaintiff must know of the essential facts of the transaction or conduct constituting the violation.

*Id.* at 1086 (citations omitted). That language seems to suggest a more stringent standard. A closer examination, however, reveals that the court did not intend to create a significantly different analysis. The opinion continued by explaining that

> somewhere between 'every last detail' and 'something was awry' lies the requisite knowledge of an ERISA violation. The proper characterization will usually turn in part on the complexity of the underlying factual transaction, the complexity of the legal claim and the egregiousness of the alleged violation. Beyond such generalizations, however, we can only say that judges, faced with particular contexts and relying on their 'situation sense,' must make the determination.

*Id.* Thus, rather than setting a new standard, the court was emphasizing the fact-specific nature of the inquiry. That idea was reinforced by the Eighth Circuit:

> when a fiduciary's investment decision is challenged as a breach of an ERISA

duty, the nature of the alleged breach is critical to the actual knowledge issue. For example, if the fiduciary made an illegal investment ... knowledge of the transaction would be actual knowledge of the breach. But if the fiduciary made an imprudent investment, actual knowledge of the breach would usually require some knowledge of how the fiduciary selected the investment.

*Brown v. American Life Holdings, Inc.,* 190 F.3d 856, 859 (8th Cir.1999) (citing *Maher,* 68 F.3d at 955–56).

The distinction drawn by Berkshire is further undermined by cases in both the Seventh and Ninth Circuits indicating that simple knowledge of a transaction is insufficient to begin the limitations period. *See Radiology Center, S.C. v. Stifel, Nicolaus & Co.,* 919 F.2d 1216, 1223 (7th Cir.1990) (remanding for the district court to determine whether reports obtained by a fund manager were sufficient to establish actual knowledge); *Waller v. Blue Cross of California,* 32 F.3d 1337, 1341 (9th Cir.1994) (refusing, in the context of a Rule 12(b)(6) motion, "to equate knowledge of the purchase of annuities in this case with actual knowledge of the alleged breach of fiduciary duty.") (citing *Fink v. National Savings and Trust Co.,* 772 F.2d 951, 957 (D.C.Cir. 1985)). *But cf. Blanton v. Anzalone,* 760 F.2d 989, 992 (9th Cir.1985)(stating that the "statute of limitations is triggered by the defendants' knowledge of the transaction that constituted the alleged violation, not by their knowledge of the law."); *Meagher v. International Ass'n of Machinists and Aerospace Workers Pension Plan,* 856 F.2d 1418, 1423 (9th Cir.1988) (quoting *Blanton* ). *See also Fink,* 772 F.2d at 957 ("The disclosure of a transaction that is not inherently a statutory breach of fiduciary duty ... cannot communicate the existence of an underlying breach.") (citations omitted).[9]

In this case, Berkshire has attached as exhibits to its motions for summary judgment the annual reports and lists of trans-

actions for each year the plans were in effect. The court has examined those documents and found them neither simple nor straightforward. By themselves, they do not provide sufficient information for the court to conclude that the Doctors had actual knowledge of an ERISA violation. Further, although the fact that the Doctors were required to approve each transaction weighs heavily in favor of finding actual knowledge, it is not apparent that the Doctors did so with adequate information. If the Doctors simply rubberstamped Mr. Meszaros's recommendations without receiving a complete explanation, they may not have had actual knowledge of an ERISA violation.

Viewing the evidence in the light most favorable to the plaintiffs, it becomes apparent that an issue of material fact exists regarding the Doctors' knowledge. As they are described in the memoranda and exhibits, the reports and annual meetings are an insufficient basis on which to conclude that the Doctors had actual knowledge of an ERISA violation. For that reason, summary judgment will be denied.

*The Doctors' Negligence*

■ Berkshire also contends that the Doctors' claim is barred by their contributory negligence. The company argues that, as plan fiduciaries, the Doctors had the duty to investigate the backgrounds of Mr. Meszaros and Mr. Walsh and to monitor the plan investments. (Meyer Mot. at 45–47.) Berkshire argues that, by allowing Mr. Meszaros free rein to manage the plans and by rubber-stamping his investment decisions, the Doctors breached their fiduciary duties. *See* 29 U.S.C. § 1104(a)(1)(B) (setting forth the "prudent investor" standard). That breach, Berkshire contends, precludes the Doctors' recovery.

In response, the Doctors do not dispute the allegation that they breached fiduciary duties. Indeed, they rely on facts that

---

**9.** This case was decided under the pre–1987   constructive knowledge provision.

might establish that breach to deny having actual knowledge of Berkshire's violations. Rather, the Doctors cite to the Supreme Court's opinion in *Harris Trust and Savings Bank v. Salomon Smith Barney Inc.,* in which the Court held that a fiduciary had standing to sue a nonfiduciary for engaging in a prohibited transaction. 530 U.S. 238, 120 S.Ct. 2180, 2190–91, 147 L.Ed.2d 187 (2000). Because Berkshire has admitted to being an ERISA fiduciary, that case does not resolve the issue presented here.

The Doctors seek recovery from Berkshire on behalf of their plans. In such a situation, one fiduciary is permitted to sue another for violating ERISA. Further, Berkshire has provided no precedent supporting the proposition that a breach by the suing fiduciary precludes such a claim. Even if the Doctors also have some liability for any damages to the plans, that argument does not provide a basis for summary judgment.

*Equitable Defenses: Ratification, Waiver, and Estoppel*

■ Finally, Berkshire raises three equitable defenses. The company contends that, because the Doctors approved the transactions and received regular reports, they ratified Berkshire's conduct, waived any claims they might assert, and should be estopped from seeking damages. (*See* Meyer Mot. at 49.) In support of that argument, Berkshire relies on *McManus & Pellouchoud, Inc. Employees' Profit Sharing Trust v. L.F. Rothschild, Unterberg, Towbin,* 1989 WL 100103 (N.D.Ill. Aug. 23, 1989) and *Schetter v. Prudential–Bache Securities, Inc.,* 695 F.Supp. 1077 (E.D.Cal.1988). The courts in those cases found that plan beneficiaries had ratified investment decisions by approving transactions and receiving notices without objecting. There is little discussion of the matter in *Schetter,* but the court in *McManus* wrote that "[t]here is no doubt that [the plaintiff] previously approved of the conduct about which he now complains," and found it important that the plaintiff had

been informed of the improper investments. 1989 WL 100103 at *3–4. The same cannot be said of the Doctors in this case.

First, the Doctors were not sophisticated investors, as was the plaintiff in *McManus. Id.* at *2, 4. Further, as the discussion in the first section indicates, there is a significant dispute about the Doctors' level of awareness of transactions and conduct by Mr. Meszaros. If the Doctors simply approved the transactions without considering them and did not understand the reports, they should not be found to have ratified Berkshire's conduct. Essentially, this analysis parallels the one undertaken to determine if and when the Doctors had actual knowledge of an ERISA violation. It, therefore, does not provide an adequate basis on which to grant summary judgment.

A separate Order follows.

### ORDER

For the reasons stated in the accompanying Memorandum, it is hereby **ORDERED** that:

1. Defendant Berkshire Life Insurance Company's motions for summary judgment as to Counts I, II, III, and IV of the plaintiffs' Amended Complaint are **granted;**

2. Berkshire's motions for summary judgment as to Count V of the plaintiffs' Amended Complaint are **denied;**

3. Berkshire's Motion to Dismiss and/or Strike is **denied** as moot;

4. Counsel will be contacted to set a trial date; and

5. Copies of this Order and the accompanying Memorandum shall be mailed to counsel of record.